[Civ. No. 2889.   Third Appellate District.—March 2, 1925.]

ANNA EHLERS, Respondent, v. C. L. BIHN et al., Appellants.

[1] CONTRACTS—SALE OF GRAPES—PARTIES—ASSIGNMENT—EVIDENCE.— In this action against an individual and a company to recover the contract price of certain grapes sold to said individual acting for and in behalf of said company, in view of the terms of the original .contract between said defendants, the procedure that had been followed in other transactions as compared with the transactions in question, and the testimony of said individual that he had assigned plaintiff's contracts to said company as required by the terms of his contract, which was not denied by the company, a fair inference was that the company approved plaintiff's grape contracts and accepted the assignments thereof

in accordance with the terms of its original contract with its co-defendant; and said original contract having provided that both defendants were interested therein and entitled to the benefits thereof, and they both having assumed its burdens, it was immaterial in whose name the grape contracts with plaintiff were executed.

[2] ID.—QUALITY OF GRAPES—FAILURE TO MAKE TIMELY OBJECTION.— Plaintiff having delivered certain black grapes to defendants at a certain railroad platform where defendants received the grapes purchased by them, which grapes were shipped by defendants and for which defendant company paid her, and thereafter she delivered more black grapes, some of which, as in the first shipment, were of a variety different from that agreed to be purchased but were of a higher market value, and of which the defendants shipped a part and made no objection to the remainder, but left them on the platform until after they were unfit for shipment, it was then too late to reject them or to object thereto.

[3] ID.—INABILITY TO GET CARS—FAILURE TO EXERCISE RIGHTS—LIABILITY.—The fact that, on account of a railroad strike, which was in progress at the time the grapes were purchased, defendants were unable to get refrigerator-cars in which to ship plaintiff's grapes did not relieve them of liability to pay for grapes delivered by plaintiff, where under the contract defendants were given the right in such case to cancel the contract or to extend the time of delivery for a period equal to that so lost, and they did neither, but allowed plaintiff to deliver the grapes to them.

[4] ID.—QUALITY OF GRAPES—PRESUMPTION—ADMISSIONS.—In an action to recover the contract price of certain grapes sold and delivered by plaintiff to defendants, but which thereafter decayed before defendants could ship same, in the absence of proof that the grapes were of the quality required by the California Fruit and Vegetable Standardization Act (Stats. 1921, p. 1235), or that defendants objected to receiving them on the ground that they did not conform thereto, it will be presumed that they were of the requisite quality; and the fact that defendants shipped a part of the grapes was in the nature of an admission that they conformed to the requirements of that act.

[5] ID.—FAILURE TO USE DILIGENCE—EVIDENCE—FINDING.—In this action to recover the contract price of certain white grapes which defendants had agreed to use due diligence in marketing, but which became a total loss due to rains, the evidence as to the condition of said grapes prior to the rains, as to the delay of defendants in furnishing the necessary boxes, and as to unnecessary delay on the part of defendants in giving plaintiff instructions to pick and deliver the grapes, justified the implied

finding of the jury that the defendants did not use due diligence in marketing the grapes and that the loss thereof resulted from such failure on their part.

[6] ID.—PRINCIPAL AND AGENT—EVIDENCE—HEARSAY.—In such action, testimony as to a conversation between plaintiff and the agent or representative who solicited such contract on behalf of defendants was not open to the objection that it was hearsay and not binding upon the defendant company; and, notwithstanding the pleadings raised no issue of fraud or mistake, the evidence having shown so conclusively that, although it was not named as the buyer therein, the contracts were made in behalf of the defendant company and that it approved them and accepted an assignment thereof, it was not prejudiced by the action of the trial court in permitting plaintiff, over the objection of said defendant company that it was an attempt to vary the terms of a written contract, to testify that the agent who solicited the contracts told her that the person named therein as the buyer was "just the manager" for said company.

[7] ID.—MANNER OF HANDLING BUSINESS — GUARANTEED PRICE — EVIDENCE.—The original contract between the defendant company and its individual codefendant having provided that the latter was "to handle business covered by this agreement in a manner as may be prescribed" by the company, the trial court properly permitted plaintiff to introduce evidence to the effect that the company instructed its codefendant to take contracts for white grapes at a guaranteed price.

[8] ID.—AMOUNT OF VERDICT—HYPERCRITICAL OBJECTION.—Where the jury find for the plaintiff and against the defendants in the sum of "$762.50 dollars. Seven hundred sixty-two & fifty cents," the criticism that the verdict is contradictory, in that "in one place it is for over seven hundred dollars and, in another place, that it is for like number of cents," is hypercritical.

---

(1) 2 C. J., p. 954, n. 81.  (2) 35 Cyc., p. 239, n. 70.  (3) 35 Cyc., p. 273, n. 74.  (4) 22 C. J., p. 144, n. 24, p. 317, n. 67; 35 Cyc., p. 239, n. 70.  (5) 35 Cyc., p. 573, n. 75.  (6) 3 C. J., p. 817, n. 20; 4 C. J., p. 975, n. 88; 22 C. J., p. 215, n. 48.  (7) 2 C. J., p. 943, n. 83.  (8) 38 Cyc., p. 1880, n. 36.

APPEAL from a judgment of the Superior Court of Napa County.  Percy S. King, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Glenn West for Appellants.

Clarence N. Riggins for Respondent.

FINCH, P. J.—The defendants filed separate notices of appeal from the judgment herein in favor of plaintiff. The parties have stipulated that the appeals be consolidated and that the same may be heard and determined on a single record.

The defendant Associated Fruit Company is a corporation which maintains offices in several cities. In so far as concerns the transactions involved in this case, its principal office is in the city of Fresno. At the time of those transactions, and for several years prior thereto, the defendant Bihn was engaged in the business of buying and shipping fruit at the city of Napa. In the year 1922 the company and Bihn agreed to co-operate in buying and shipping fruit produced in Napa County and certain adjacent territory. They reduced their agreement to writing in the form of a letter signed by the company, dated July 7, 1922, addressed to Bihn and accepted by him in writing, as follows:

"This confirms our understanding with you whereby you are to work with us exclusively for the balance of the season 1922 in the soliciting, buying and shipping of fruits and vegetables, except as herein otherwise provided. It is agreed that you will not operate in any other territory except Napa County and to and including Cordelia, Solano County. You are to solicit in our name, but you are to buy in your name subject to our approval and immediately assign such contracts to us. You are to demand and receive written acknowledgment of every contract assigned to us immediately after you have closed such contract with growers or others with our approval. . . . We are to have the sale of any fruit that you may secure or buy as stipulated herein. The profits or losses are to be divided 30% credited or charged to your account—70% credited or charged to our account. You are to pay all of your own expenses including the expense of any agents that you may employ, . . . we are to pay all of our over-head expense, including the expense of Mr. Lacey and any office assistance that he may require. . . . It is agreed that we furnish shook and loading material at cost, your account to be charged with 30% of the cost of any carry-over. . . . It is distinctly understood that you are not to act as our agent in the pur-

chase of fruits and vegetables under this agreement and that we shall not be held responsible for any of your acts unless approved by us in writing. It is understood that you agree to handle business covered by this agreement in a manner as may be prescribed by us from time to time, excepting as herein otherwise stipulated. . . . ''

Mr. Lacey, whose name is mentioned in the contract, appears to have had at least general supervision over the company's office at Napa and he signed checks in behalf of the company in payment for fruit purchased by Bihn under the latter's contract with the company. The company and Bihn ''jointly'' established an office in the city of Napa with an office sign containing the names of both the company and Bihn. In carrying out his part of the agreement Bihn employed several men to go out among the grape-growers and solicit contracts for the purchase of their grapes, among them being G. E. Tobin and Walter Rossman. Under his direction they distributed among the growers attractive blotters, on which the company's name was printed in large letters between beautifully colored clusters of grapes, and proceeded, in accordance with the terms of the agreement, to ''solicit'' in the company's name and, after leading the grower up to the selling point, to ''buy'' in Bihn's name. In this manner Bihn entered into contracts with approximately one hundred growers. Standard forms of contracts were used and they were executed in triplicate, the name of the company not appearing therein. One copy was left with the grower, one with Bihn, and the third was sent to the company for approval. The company mailed its copy back to Bihn with a ''characteristic'' hieroglyphic crayon mark in the lower left-hand corner, which was probably intended to be the initial of some person's name, carelessly written. Bihn treated these marks as approvals of the contracts on which they appeared. He testified: ''The papers would come back from the Associated Fruit Company. They would have that on them. . . . I would go right ahead shipping grapes. . . . I received likely every contract approved and a list of them in a letter, which was also received, something like that.'' He did not preserve the letters. The growers were given company checks in payment for their grapes. The company furnished the growers boxes

in which to pick their grapes. Some of the boxes were stamped with the company's name, others were not.

Rossman called on plaintiff at her residence and said, according to plaintiff's testimony, "that he was soliciting or buying, as you would say, grapes for the Associated Fruit Company," and gave her and her son some of the company's blotters. He said that the Associated Fruit Company would buy the black grapes and ship the white grapes on consignment. Thereafter, about the first of September, Tobin called on plaintiff, gave her a company blotter, and said that he was representing the company. He made three or four calls before plaintiff agreed to sell her grapes. Finally, on the eighth day of September, Tobin presented two contracts for plaintiff's signature in which Bihn's name appeared as buyer. To plaintiff's inquiry as to the use of Bihn's name in the contracts instead of that of the company, Tobin replied, "That is all right, that is just the manager." Plaintiff then signed the contracts which follow. Printed forms were used, the italicized parts being written in pencil. The black-grape contract reads as follows:

"This certifies that *Ana Ehlers . . .* has sold *all wine grapes* all the fruit crops hereinafter specified that buyer shall find suitable for eastern markets during the year 192.. on the following described premises: *15 acres* Delivered at *St. Helena* Variety *Petit Syra* Price per ton *85.00* Quantity—Tons *25* The seller agrees to pick and deliver all of said fruit at his own expense, in good condition, entirely free from mildew, or smut, or rain, or sand damage, and free from any damage whatsoever, and at the times directed by the buyer. The buyer agrees to pay for said fruit upon completion of delivery thereof and presentation of weigh-tags therefor, at the office of the buyer at *Napa,* California. In the event of a strike, quarantine, boycott, embargo, fire, or failure of transportation companies to provide refrigerator cars, directly or indirectly affecting buyer's ability to perform this contract, buyer may cancel this contract, or extend time of delivery for a period equal to that so lost. . . . This said contract shall be subject to any state or federal law or laws, rule or rules, regulating food products and the distribution thereof, and the crops herein purchased shall comply with any and all such laws, rules and regulations.

This contract is understood by the parties hereto to constitute an immediate sale, transferring title to buyer, but until delivery has been completed, seller agrees to, and does, assume all risks of loss, depreciation or damage, of whatever kind or nature, to any undelivered part of said crops. . . . Time is of the essence of this agreement, and no understanding other than herein expressed shall vary or modify this transaction.''

The white-grape contract contained the following covenants:

''*Anna Ehlers* hereinafter called the grower, hereby places the entire crop of *white grapes* grown on the property known as the *Mount View being the property of Anna Ehlers Grower has privilege of disposing of white grapes if she can get higher price* for the season of 1922, good quality, suitable for eastern market, in the hands of C. L. Bihn to pack and market for the grower's account on the following terms and conditions: *buyer to guarantee shook and freight charges and $30.00 per ton.* Said fruit to be picked and delivered at grower's expense to the packing house provided by shipper at *St. Helena,* California. C. L. Bihn to receive for furnishing all material and labor in packing and loading said crop of fruit the general rates in force during the current season. C. L. Bihn shall have the right to sell said fruit to the best possible advantage, and shall receive for its services in marketing said crop 10 cents per package, plus selling expense at destination, together with all transportation, refrigeration, revenue tax, collection and other charges advanced by it. C. L. Bihn agrees to use due diligence in marketing said fruit for all the parties hereto. . . . This contract shall not be revocable during its term.''

[1] It was admitted at the trial that the company received one of the triplicates of each contract ''about the time they bear date.'' They were returned to Bihn with the characteristic crayon mark in the lower left-hand corner. The original exhibits have been transmitted to this court. Nothing appears upon the grape contracts to show that Bihn assigned them to the company. Relative to the assignment of the black-grape contract, he testified as follows: ''Q. Did you make any written form of assignment of that contract to the Associated Fruit Company? A. Yes, it is indorsed,

signed on the back in my name. . . . It was on the original."
There was properly admitted in evidence, over the company's objection, a paper, marked "copy" on the face thereof, in which the plaintiff is "called the seller" and the "Associated Fruit Company" the buyer, bearing the same date and containing substantially all the terms and descriptions of the black-grape contract, and signed "Anna Ehler" and "Associated Fruit Co. by C. L. Bihn." In the lower left-hand corner are the words, "Approved by —— Officer of A. F. Co." In the blank space appears the aforesaid crayon mark. Bihn testified that he received this paper .from the company. Neither he nor plaintiff affixed their respective names thereto. He testified that he mailed copies of all grape contracts to the company and received in reply documents in approximately the form of the foregoing paper. The company made no effort to explain the significance of such documents or of the crayon marks thereon and on the copies of the grape contracts which were signed by plaintiff and Bihn. Neither was there any denial of Bihn's testimony to the effect that he assigned the grape contracts to the company. These were all matters peculiarly within the power of the company to prove or disprove and, in view thereof, a fair inference from all of the foregoing evidence is that the company approved the contracts and accepted the assignments thereof in accordance with the terms of its original agreement with Bihn. Under the circumstances shown by the evidence it is immaterial in whose name the grape contracts were executed. Both defendants were interested therein and entitled to the benefits thereof, and they both assumed and must bear its burdens. (*Cutting Packing Co.* v. *Packers Exchange,* 86 Cal. 574 [21 Am. St. Rep. 63, 10 L. R. A. 369, 25 Pac. 52]; *Robinson* v. *Rispin,* 33 Cal. App. 536 [165 Pac. 979].)

[2] Plaintiff delivered four truckloads of black grapes, which were shipped by defendants and for which the company paid her. It appears that the defendants did not have a packing-house at St. Helena but received the grapes purchased by them on the north end of the Southern Pacific platform. Thereafter she delivered two more truckloads of black grapes, of which the defendants shipped forty-five boxes and made no objections to the remainder on any

ground, but left them on the platform until they were unfit for shipment. While on the platform these grapes were kept covered, presumably by defendants, to protect them from the weather. In this lot, packed in separate boxes, there were about six hundred pounds of a different variety of black wine grapes from those purchased but of a higher market value. They were not rejected and no objection was made to them until long after their delivery. Some of the same variety were included in the first shipment. After they had decayed while in defendant's possession, it was too late to object.

[3] Appellants contend that, on account of a railroad strike, they were unable to get refrigerator-cars in which to ship this lot of grapes and that therefore they are not liable. Under their contract with plaintiff they were given the right in such a case to "cancel this contract, or extend time of delivery for a period equal to that so lost." They did neither, but allowed plaintiff to deliver the grapes to them and, of course, it was then too late either to cancel the contract or extend the time of delivery. The strike was in progress at the time the grapes were purchased and continued through the grape-picking season. The defendants therefore had ample opportunity to cancel the contract or postpone delivery until they could secure cars.

[4] It is contended that plaintiff was not entitled to judgment because there was no proof that the grapes were of the quality required by the California Fruit and Vegetable Standardization Act. (Stats. 1921, p. 1235.) The testimony shows that the grapes were in "good condition," "excellent condition," and "suitable for eastern market." There was no proof to the contrary, nor was any objection made by defendants to receiving them on the ground that they did not conform to such standards. The facts are unlike those in *MacRae* v. *Heath,* 60 Cal. App. 64 [212 Pac. 228], where the evidence showed positively that the fruit there in question did not conform to the required standards. In the absence of evidence to the contrary, the presumption is that the law has been obeyed. The fact that defendants shipped a part of the grapes is in the nature of an admission that they conformed to the requirements of the act.

[5] Plaintiff testified that the white grapes were ripe early in September and that during that month she frequently asked Tobin for boxes in which to pick them and requested that they be shipped immediately. Bihn testified that the company finally sold the white grapes and that on the first day of October he gave Tobin orders to deliver boxes to plaintiff in which to pick the grapes and to instruct her to pick them. Arrangements had then been made for a car in which to ship them. Tobin did not communicate this information to the plaintiff until October 5th. A load of boxes was delivered to her October 1st and another October 7th. On the 2d of October .20 of an inch of rain fell; .81 on the 3d, and .03 on the 4th. The 5th, 6th, and 7th were clear. On the 8th .04 of an inch of rain fell; .04 on the 9th; .62 on the 10th, and .06 on the 11th. Plaintiff testified that she picked eight or nine tons of the white grapes before the rain which commenced on the 8th of October and that the white grapes were not damaged by the rains which had theretofore fallen. She picked the remainder after the later rains and delivered all of them on the Southern Pacific platform, the last load being delivered October 14th. The defendants refused to accept them and they became a total loss. The testimony shows that the white grapes were in good condition prior to the rain commencing on the 8th. Bihn testified that normally the season for shipment of grapes of the variety described in the white-grape contract ended about October 20th. The white-grape contract contains no clause excusing performance by the buyer in the event of a strike or inability to obtain cars, but the buyer therein "agrees to use due diligence in marketing said fruit." If it be conceded that the defendants used due diligence up to the 1st of October, when they had succeeded in getting a car, their notice to plaintiff on the 4th to pick her grapes and the delivery of the boxes on the 7th did not constitute due diligence, in view of the lateness of the season and the length of time which had elapsed after the grapes were ripe and ready for shipment. It cannot be said that the evidence is insufficient to support the implied finding of the jury that the defendants did not use due diligence in marketing the grapes and that the loss thereof resulted from such failure on their part.

[6] Plaintiff was asked, in direct examination to relate a conversation she had with Rossman before she signed the contracts. Counsel for the company objected on the ground that such conversation was hearsay and not binding upon the company. The objection was overruled and the witness testified that Rossman said that in the event of a shortage of cars the buyer would sell them locally. Counsel for the company then objected on the further ground "that it is an attempt to vary the terms of a written contract by parol evidence." Counsel for plaintiff thereupon withdrew the question. The question was not subject to the first objection and no motion was made to strike out the answer. Plaintiff was asked if Tobin made any statement "about the name of Bihn" when the contracts were presented to her for signature. Counsel for the company objected "on the ground that it is an attempt to vary the terms of a written contract." The objection was overruled and the witness answered that she asked Tobin concerning the use of Bihn's name in the contract and that Tobin replied: "Oh, that is all right, that is just the manager." The pleadings raised no issue of fraud or mistake, but if it be conceded that the objection should have been sustained, the evidence shows so conclusively that the contracts were made in behalf of the company and that it approved them and accepted an assignment thereof that no prejudice could have resulted from the admission of the testimony.

[7] It is urged that the court erred in admitting testimony to the effect that the company instructed Bihn to take contracts for white grapes at a guaranteed price. The agreement between the company and Bihn provided that he was "to handle business covered by this agreement in a manner as may be prescribed" by the company. The evidence, therefore, was properly admitted.

[8] The verdict of the jury reads as follows: "We, the jury in the above-entitled cause, find for the plaintiff and against both defendants above named, in the sum of $762.50 dollars. Seven hundred sixty-two & fifty cents." Appellants contend that "the verdict is contradictory. In one place it says it is for over seven hundred dollars and, in another place, that it is for like number of cents." The criticism is hypercritical.

The contention that the court erred in giving and refusing instructions is sufficiently disposed of by what has already been said in considering the defendants' liability under the facts stated. Other contentions made are without merit and it is unnecessary to further extend this opinion by a discussion of them.

The judgment is affirmed as against both defendants.

Hart, J., and Plummer, J., concurred.