### TOBIN v. KANSAS MILLING CO.
No. 4329.

United States Court of Appeals
Tenth Circuit.

Feb. 22, 1952.

Huxman, Circuit Judge, dissented.

Joseph D. Mladinov, Atty., U. S. Dept. of Labor, Washington, D. C. (William S.

Tyson, Solicitor, U. S. Dept. of Labor, Bessie Margolin, Asst. Solicitor, U. S. Dept. of Labor, William A. Lowe, Atty., U. S. Dept. of Labor, all of Washington, D.C., and Francis M. Cook, Regional Atty., U. S. Dept. of Labor, Kansas City, Mo., on the brief), for appellant.

Dale M. Stucky, Wichita, Kan. (Howard T. Fleeson, Homer V. Gooing, Wayne Coulson, Paul R. Kitch and Donald R. Newkirk, all of Wichita, Kan., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

W. R. McComb, Administrator of the Wage and Hour Division of the United States Department of Labor, brought this action against the Kansas Milling Company[1] seeking a judgment enjoining the Milling Company from violating the provisions of § 15(a)(1), (2), and (5) of the Fair Labor Standards Act of 1938,[2] 52 Stat. 1060, 29 U.S.C.A. §§ 201 et seq. The complaint was filed April 28, 1949. The case came on for trial March 7, 1950.

The Milling Company is engaged in the operation of an elevator and flour mill at Cherryvale, Kansas, where it purchases and stores wheat and manufactures flour and feed. It also operates like plants at other points in Kansas. The Cherryvale plant has an elevator department, a flour mill department, and a warehouse department. The elevator department and the flour mill department are distinct and separate operating departments. The Milling Company employs approximately 26 employees at its Cherryvale plant, among whom are an elevator foreman and three second millers. At the commencement of the trial, it was stipulated that the elevator foreman and the three second millers were engaged in the production of goods for commerce and that "during the period from beginning in December, 1946, and particularly to December, 1948," the three second millers and the elevator foreman worked in certain weeks in excess of 40 hours and in certain other weeks less than 40 hours,

1. Hereinafter called the Milling Company.

2. Hereinafter called the Act.

and that they were compensated on a monthly salary, which was the same whether they worked more or less than 40 hours. There was no proof that the number of hours worked weekly by such employees after December, 1948, was in excess of 40 hours. Following the stipulation, the Administrator rested.

The Administrator promulgated regulations, effective October 24, 1940, defining the term "employee employed in a bona fide executive * * * capacity" in § 13(a) of the Act. The provisions of such regulations here material read as follows:

"*Executive.* The term 'employee employed in a bona fide executive * * * capacity' in section 13(a)(1) of the Act shall mean any employee

"(a) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(b) who customarily and regularly directs the work of other employees therein, and

"(c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(d) who customarily and regularly exercises discretionary powers, and

"(e) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(f) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 per cent of the number of hours worked in the workweek by the nonexempt employees under his direction: *Provided,* That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment."

Thereafter, the Administrator promulgated amended regulations, effective January 25, 1950, defining the term "employee employed in a bona fide executive * * * capacity." The provisions of the amended regulations which changed the former regulation and are here material read as follows:

"(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

"(b) Who customarily and regularly directs the work of two or more other employees therein; and

* * * * * *

"(e) Who does not devote more than 20 per cent to his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: *Provided,* That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

"(f) Who is compensated for his services on a salary basis at a rate of not less than $55 per week (or $30 per week if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities:

"*Provided,* That an employee who is compensated on a salary basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all of the requirements of this section."

The Milling Company introduced evidence undertaking to establish that the elevator foreman and the three second millers were employed in a bona fide executive capacity and were, therefore, exempt under § 13(a)(1) of the Act.

The trial court made findings of fact which brought the elevator foreman and the three second millers within the term "bona fide executive * * * capacity" as defined in both regulations, and entered a judgment for the Milling Company. Maurice J. Tobin, Secretary of Labor, was substituted as party plaintiff and has appealed from such judgment.

The appeal involves only the elevator foreman, Archie Hatcher, and one second miller, Fred Honeywell, and is predicated on the contention that as to those two employees the findings are clearly erroneous.

The elevator department has a wheat storage capacity of 150,000 bushels. Wheat is delivered to the elevator by railroad box car, motor truck, and wagon. Wheat delivered by box car is unloaded into a dump by employees called shovelers. Wheat arriving by motor truck is unloaded at a truck dump and by wagon at a wagon dump. After the wheat is unloaded, it is elevated to the elevator by machinery and is binned according to various characteristics of the wheat. Wheat in the elevator is maintained in proper condition, fumigated, turned, aerated, separated, and mixed for the mill. Records are kept and weekly inventories are made of the amount and qualities of wheat in the elevator.

Hatcher, as elevator foreman, is in complete charge of the maintenance and operation of the elevator department at the Cherryvale plant. He participates in management conferences and he customarily and regularly exercises discretionary powers in the preformance of his duties. He supervises an elaborate operation requiring skill, knowledge, experience, and judgment. He is qualified for the position he holds. He performs a negligible amount of manual labor, and, with minor exceptions, does not perform any service similar to that performed by employees under him. He has power to hire and discharge employees and regularly exercises such power. After the wheat is unloaded at the elevator, Hatcher, in the exercise of judgment, determines its moisture, protein, and fragment content, its baking quality, and other important characteristics. During the periods when wheat is moving to the elevator, it is ordinarily operated 24 hours a day. Two shovelers are employed during each eight hour shift, and during the day shift two additional shovelers are employed to handle the clean up, the sweeping, and the shoveling of screenings. During periods, which in the aggregate cover several months, when a small amount of wheat is being received at the elevator, only one shoveler is employed. The amount of wheat received at the elevator varies, depending on the demand for flour and the amount of wheat in storage. While a large amount of wheat is usually received at harvest time, heavy movements also occur at other times. Hatcher customarily and regularly directs the work of all the elevator employees. During the period when it was stipulated that Hatcher worked in excess of 40 hours per week, he received a salary of $220 per month. At the time of the trial he was receiving a larger salary.

Honeywell was employed by the Milling Company in January, 1948, as an apprentice second miller for "on the job training" under the Act of June 22, 1944, as amended, 58 Stat. 284, 287, 38 U.S.C.A. Pocket Part C. 12, part VIII. Prior to April 28, 1949, he had acquired sufficient training and experience to perform the duties and discharge the responsibilities of a second miller. On occasions he had complete supervision of the operation of the flour mill at night and was qualified to discharge that responsibility, but he ordinarily worked as a daytime second miller. In the performance of his duties he exercised discretionary powers. He had power to hire and discharge employees working under him. He actively managed the flour mill during his working shift. He supervised and directed the work of two employees who worked under him, a maintenance man and a sweeper-oiler. The duties of the sweeper-oiler were to oil the machinery, do sweeping and perform similar physical tasks. The duty of the maintenance man was to perform major repair work.

When the mill is shut down for repairs, Honeywell has the supervision of a crew of more than two employees doing repair work. It is his responsibility to exercise technological skill and he does exercise such

skill in producing quality flour. He has to see to it that the rolls are properly set, the wheat correctly tempered, and the flour properly sifted. He participates in conferences with the head miller and the elevator foreman in determining what flour and what grade of flour shall be made on a particular day. He has authority to shut the mill down. It is his responsibility to observe the operation of the flour mill, see that everything is running properly and that the wheat is coming in and is properly ground into flour. With minor exceptions, he does not perform any service similar to that performed by the employees under him.

. Honeywell continually walks throughout the mill supervising the operation of the machinery, seeing that it is maintained in proper adjustment and functions properly.

When Honeywell entered the employ of the Milling Company he received a salary of $137.50 per month. Shortly thereafter it was increased to approximately $155 per month. At the time of the trial he was receiving $185 per month. Such salaries are exclusive of government subsistence pay. The government subsistence pay is the difference between the salary paid Honeywell and the regular second miller's salary.[3]

The Administrator, in a letter ruling dated November, 1941, stated: "The requirements of the Regulations are satisfied if an executive employee supervises one permanent employee and on fairly frequent occasions, as need arises, supervises additional temporary employees." Wage and Hour Opinion Letter, November, 1941, 3 C.C.H. Labor Law Reporter, p. 22,038, § 25,210.101.

It is clear that under such letter ruling, Hatcher met the requirements of paragraph (b) of the 1940 Regulation.

The Explanatory Bulletin of the Administrator, § 541.116, 2 C.C.H.Labor Law Reporter, p. 20,759, § 23,301.116, states: "Trainees, Executive—The exemption is applicable to an employee employed in a bona fide executive capacity and does not include employees training to become executives and not actually performing the duties of an executive."

Under the quoted portion of the Explanatory Bulletin, Honeywell was not excluded from the exemption by reason of the fact that he was taking "on the job training," because he actually performed the duties of an executive.

■ We are of the opinion that under the proven facts Hatcher and Honeywell were employed in a bona fide executive capacity from prior to the filing of the instant action up to January 25, 1950, as that term is defined in the 1940 Regulations.[4]

During intermittent periods which aggregated several months in the year, when only a small amount of wheat was being received at the elevator, Hatcher supervised only one employee. After January 25, 1950, Honeywell did not receive, exclusive of the government subsistence pay, compensation equal to $55 per week. We deem it unnecessary to decide whether, because of those facts, they ceased to be employed in a bona fide capacity on January 25, 1950, because of the changes made by the 1950 Regulation. The stipulation with respect to work in excess of 40 hours per week was limited to the period from December, 1946, to December, 1948. There was no proof that either Hatcher or Honeywell worked in excess of 40 hours per week in the period between January 25 and March 7, 1950.[5]

■ In February, 1949, after the Milling Company learned that a claim was being asserted that it was violating the Act at its Cherryvale plant, David Jackman, Jr., assistant to the general manager of the Milling Company, made an investigation at the Cherryvale plant and reached the conclusion, which was justified by the facts, that the elevator foreman and the second millers were employed in a bona fide executive capacity, and that the Milling Company was in compliance with the Act. Since the Milling Company was in compliance with the

3. See 38 C.F.R., 1945 Supp., 36.228; 10 F.R. 1243, issued January 18, 1945.

4. See Walling v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088.

5. The finding of the trial court with respect to work in excess of 40 hours per week was clearly predicated on the stipulation and referred to the time between December, 1946, and December, 1948.

Act from prior to the filing of the instant action up to January 25, 1950, we are of the opinion that it cannot be presumed that it failed to comply with the Act after January 25, 1950. There is a presumption that a person obeys the law and discharges obligations imposed upon him by law.[6] The presumption has been applied in a wage and hour case.[7] The fact that there was no affirmative proof that the elevator foreman and second millers did not work in excess of 40 hours per week after January 25, 1950, does not indicate that the contrary was true. The case, when filed, was predicated on the theory that the elevator foreman and second millers were not employed in a bona fide executive capacity under the 1940 Regulation. After the 1950 Regulation became effective no supplemental pleading was filed and the case was tried primarily on the theory that the elevator foreman and second millers were not employed in a bona fide executive capacity, as that term was defined in the 1940 Regulation.

The judgment is affirmed.

HUXMAN, Circuit Judge (dissenting).

As I construe the majority opinion, it is predicated on the theory that the stipulation of fact with respect to work in excess of 40 hours did not relate to the time between January 25, 1950, when the new regulation went into effect, and March 7, 1950, the date of trial. It is then argued that since there was no evidence introduced as to hours of work during that period and since there is a presumption of lawful conduct, the presumption must be that there was no violation with respect to excess workage during this period. With this I cannot agree. This was not in my view the theory upon which the case was tried and decided in the lower court, nor was it the theory upon which it was presented to us. The case was tried upon the theory that the questioned employees were executives and were being paid the minimum amount required by the regulation for executives. Nowhere is there a contention or intimation that there was a change in the work hours after January 25.

In Finding No. 3 the trial court found the time involved as extending to March 7, 1950. The court found that "During the periods hereinafter stated" the employees in question were foremen as follows: "Elevator Department. Archie Hatcher—Elevator Foreman—December, 1946, to date of trial, March 7, 1950. Mill Department. Frederick Honeywell—Second Miller—January 18, 1946, to date of trial, March 7, 1950." In its Finding No. 10, the court found that "* * * all of the aforesaid employees worked more than forty (40) hours in certain of the work-weeks in the *periods of time involved* * * *". Having in Finding No. 3 fixed the period of time involved as ending March 7, 1950, it seems to me that the presumption must be that this was the period of time the trial court had in mind when it found that during that time the employees worked in excess of 40 hours per week.

Appellee's brief will be searched in vain to find that it was contending that there was a change in work time after January, 1950, or that it relied on a presumption of compliance with the new regulation during that period of time. It does object to a consideration of the period of time between January 25 and March 7, but only because of the minimum salary requirement as to executives, which was increased under the new regulation. Thus it states in its brief: "The administrator is concerned with only two things in his brief. He is concerned (1) with the forty-one days between January 25, 1950, and the time of trial. He is concerned (2) with that portion of Honeywell's $55.00 weekly salary during those

6. Snyder Bros., General Agency v. Morgan, 24 Tenn.App. 131, 141 S.W.2d 508, 511; Toni v. Kingan & Co., 214 Ind. 611, 15 N.E.2d 80, 84; Jubilee Yacht Club v. Gulf Refining Co., 245 Mass. 60, 140 N.E. 280, 281; Tomberlin v. Waycross Commercial Hotel Co., 41 Ga.App. 77, 152 S.E. 300, 301; Planters' Operating Co. v. Commissioner, 8 Cir., 55 F.2d 583, 586; White County Bank v. Clermont State Bank, 37 Ga.App. 268, 140 S.E. 767, 769; Ehlers v. Bihn, 71 Cal. App. 479, 235 P. 673, 676; New York Life Ins. Co. v. Haru Fukushima, 74 Colo. 236, 220 P. 994, 995.

7. Fleming v. Bernardi, D.C., 1 F.R.D. 624, 626.

forty-one days above $42.70 per week, which portion was contributed by the Government as the result of the on-the-job training program." Appellee then argues that the salary requirement of $55.00 per week during this period of time should not be considered and then states: "But, even if the Government's contribution be disregarded, it still does not help appellant. This is because the payment involves a period of time not in issue in this law suit, the forty-one days before trial. The reference to *wages* after January 25, 1950, in the Findings can be regarded as surplusage." From this statement, it clearly appears that the court did consider the period of time from January 25 to March 7 as part of the time involved and that during that time excess hours were worked. Appellee says in its brief that this should be disregarded as surplusage. In all of this the emphasis is merely upon the wages and nowhere is there an intimation that there was a change in hours of employment.

It is thus clear to me that the case was tried upon the assumption by all parties, including the court, that throughout the entire period up to March 7, 1950, excess hours were worked. The court pitched its decision squarely on the ground that these two employees were executives and that the limitation as to hours did not apply to them.

I fail to find any substantial evidence supporting the court's finding that Hatcher customarily and regularly directed the work of more than one other employee. This not only appears from his own testimony, but is made clear by the testimony of Jackman, Assistant to the General Manager of appellee's mill at Wichita. He was Manager of the Cherryvale mill until October, 1947. He testified positively that for six or seven months of the year Hatcher had only one man under him in the grain elevator. This does not constitute such customary or regular direction of the work of other employees as is contemplated by the regulations. It seems to me that it may also fairly be stated

that Honeywell's own testimony reveals that he did not ordinarily and customarily have other employees under his supervision, although in his case there is no such positive testimony as in the case of Hatcher. It is without dispute that after January 25, 1950, the salary paid him by appellee did not equal $55.00 per week. That sum could be reached only by adding to the salary paid him by the company the subsistence the Government paid him for on-the-job training under the G.I. Bill of Rights. Veterans' subsistence pay is granted so they may go to school and fit themselves for a particular calling or employment—in this case, the position of a miller. The company did not consider Honeywell qualified to hold the position of a miller. It refused to pay him the minimum salary for such a position. It employed him as an apprentice miller. An apprentice is one who works while studying to fit himself for a particular position. Appellee stresses the responsibilities of a miller, the great amount of discretion and exercise of judgment that go with the position. When Honeywell came to appellee, he had been a truck driver. Whether he had ever seen a flour mill is questionable. It is certain that he knew nothing of the operation of a flour mill or of the work of a miller. To say that such a person is a qualified miller, possessing that rare judgment which the company stresses as necessary to the making of high grade flour, to say nothing of trusting him with management and responsibilities of the most important department of the flour mill would seem to do violence to understanding. In any event, it is sufficient to say that Hatcher and Honeywell each without dispute lacked one of the qualifications of an administrative executive officer—Hatcher did not ordinarily have supervision of other employees and Honeywell was not paid by his employer the minimum base salary required by the regulation. The standards of the regulations have the force and effect of law. All the requirements are mandatory and must be complied with before one can fit the qualification.[1]

1. Walling v. Yeakley, 10 Cir., 140 F.2d 830; Helliwell v. Haberman, 2 Cir., 140 F.2d 833; Marchant v. Sands Taylor & Wood Co., D.C., 75 F.Supp. 783.

It is my view with respect to the period of time from January 25, 1950, to March 7, 1950, that appellee violated the act with respect to these two employees and that an injunction should have ·been granted.