[Civ. No. 2836. Fourth Dist. Nov. 25, 1942.]

Z. ASAMEN, Respondent, v. J. L. THOMPSON et al., Appellants.

662

Harry W. Horton and Whitelaw & Whitelaw for Appellants.

Hickcox & Provence for Respondent.

GRIFFIN, J.—On an appeal from an order refusing to dismiss an attachment in the above-entitled action this day decided (*ante,* p. 657 [131 P.2d 839]), the allegations of the original complaint were summarized and the issue there presented was determined.

On February 28, 1940, plaintiff and respondent filed his amended complaint, alleged the transaction and agreement set forth in the original complaint, designated the Crown Packing Company, a corporation, as party defendant, and alleged generally that J. L. Thompson and J. T. Bunn acted together as a copartnership and that in transacting their business as such copartners they did business under the firm names of Thompson and Bunn, J. L. Thompson Company, and Crown Packing Company, and that they did use the corporation's name with its consent, as an instrumentality by and through which they conducted their partnership business at all times mentioned; that it was the intention and purpose of J. T. Bunn in signing the written agreement above the name Crown Packing Company, to sign the same for and on behalf of himself and his copartner J. L. Thompson; that the contract was signed with the knowledge and consent of Thompson and with the purpose and intent of entering into the agreement for and on behalf of the partnership of J. T. Bunn and J. L. Thompson; that defendants Bunn and Thompson and each of them represented themselves as copartners to the plaintiff; that they were and did constitute the Crown Packing Company; that the Crown Packing Company, a corporation, is a corporation in name only and did not possess or own any assets of any substantial value whatsoever; and that all the moneys received by the defendants Thompson and Bunn from the proceeds of carrots sold by them pursuant to the written agreement were deposited in their various partnership accounts except that of the Crown Packing Company, and checks were drawn on the partnership accounts and made payable to the plaintiff. In the amended complaint plaintiff added an additional count alleging that defendants were indebted to him in the sum of $10,889.87, on account of goods and produce sold and delivered to them.

Defendants Crown Packing Company, a corporation, J. T.

Bunn and J. L. Thompson, individually and in all of their alleged capacities, answered the amended complaint. Bunn and Thompson denied that they executed the agreement in any capacity as sued but claimed that the Crown Packing Company, as a corporation, through J. T. Bunn, as an officer thereof, did sign the agreement for the corporation and not otherwise. Each defendant denied generally the other allegations of the amended complaint and claimed that the plaintiff fraudulently misrepresented the grade of the carrots and therefore the corporation was not bound by the agreement; that the plaintiff misinterpreted the terms of the agreement and misapplied the application of its terms to the facts. By way of answer and cross-complaint the Crown Packing Company, a corporation, alleged such claimed misrepresentation of the grade of the carrots and that by reason thereof the carrots thus harvested did not realize on the market a price sufficient to pay the $1.05 packing and growing cost and that by plaintiff's neglect in packing, harvesting and loading such inferior grade of carrots the corporation was damaged in the sum of $5,000. The corporation prayed judgment accordingly and that the court reform the agreement to express the true intent of the parties.

Plaintiff answered the cross-complaint and alleged that the defendants saw and inspected each car of carrots at the time they were loaded and that they accepted them for sale under the agreement and therefore they were thereby estopped from denying any liability under the contract. A jury was demanded by plaintiff and after trial a verdict was returned in his favor and against all defendants, jointly and severally, in the sum of $7,250. No findings of fact or conclusions of law were made or signed by the trial court. Judgment on the verdict was entered by the clerk. Defendants moved for an instructed verdict and judgment notwithstanding the verdict, which were denied. Likewise denied was a motion to set aside the verdict and judgment on certain grounds, one of which was that the court failed to make findings of fact and conclusions of law. On January 18, 1941, the trial court, on its own motion, ordered the clerk to enter a corrected judgment in the same amount and against the same defendants. From the judgment and these orders defendants appeal.

First, it is argued that although the evidence might have been sufficient to sustain the judgment as to the Crown Packing Company, it was insufficient to show that Thompson

or Bunn were liable individually or in any capacity whatsoever. The evidence, although conflicting, if believed by the jury, was also sufficient for this purpose. Considering the evidence most favorable to respondent, as we must do in determining this question, it shows that in May, 1939, one Omatsu, field man for the Crown Packing Company, Thompson and Bunn met Asamen in his carrot field "to see the carrots"; that Omatsu introduced Bunn and Thompson and said that "Thompson was a partner of Mr. Bunn"; that after a short conversation they all went through the carrot field; that "Omatsu picked a few carrots here and there and showed it to Mr. Bunn and Mr. Thompson"; that Asamen spoke to Omatsu and said: "Does this boss have any money?" to which he replied: "Don't worry about the money. He has got about a million dollars to back him."

One Fujimoto, a witness for respondent, testified that he grew the carrots here involved; that he was present the day the written agreement was made; that he conversed with Thompson; that he had known him ten years; that he asked him if he was still with Mr. Bunn and he said "Yes, I have a joint deal with him on everything in Imperial Valley but I have a business of my own at Yuma"; that Thompson told him that he had made a "general survey of the condition of the carrots throughout the United States and this was a good place to make some money, and he thought the carrots would go up to $1.75 to $2.00, and he said he had a brand known as the Jo-Jo brand and with using that brand he was positive he would get top prices"; that he didn't tell Asamen that Thompson and Bunn were working as partners but did tell him that they had a joint deal and that they were working together because "Thompson said he would handle the entire selling deal"; that Asamen's bookkeeper typed the agreement; that Thompson dictated it and later read it and handed it to Bunn to sign; that Fujimoto acted as interpreter; that during the entire conversation nothing was said about the Crown Packing Company; that the first time he ever heard about the corporation was when the bank account was attached.

Asamen testified that he did not have any recollection of the Crown Packing Company and would not have signed the agreement if he had thought he was dealing with anyone other than Thompson and Bunn.

One Miller, field man for Asamen, testified that shortly before signing the contract Mr. Bunn introduced Thompson

to him and said: "Mr. Thompson and I are working on a deal to handle these carrots for Mr. Asamen."

One other witness, shed foreman where carrots were packed, testified that Thompson was there every day; that Thompson and Bunn generally came together and that he never saw one of them alone that he could remember; that when one of them spoke to give orders he would always say "We want this" or "We will do this."

Bunn testified in reference to the first conversation when all were present that "*We* don't have any such thing as an interpreter. *We* stood there in the shade of a tree and all talked about the carrot field and what he wanted *us* to do for him and how he wanted *us* to handle the carrots, the same as *we* are talking now. Q. Did he speak in English? A. Yes, sir, enough so that *we* knew what the deal was that he gave *us*." (Italics ours.)

After some of the carrots were sold Asamen received a letter dated June 20, 1939, reading as follows:

"Enclosed is '*our check*' No. 1448 payable to yourself in the amount of $5167.49, together with a complete account on each and every car as per statement enclosed. In compliance with our understanding and agreement, inasmuch as these cars did not bring the $1.05 per crate, which sum you felt was the cost to you for harvesting, packing and loading, we have not charged any commission, and are paying you the full amount received for said cars. Had these cars been graded U. S. No. 1, as was our understanding, there would have been no difficulty in receiving your costs back plus a nice commission to us. There remains about 13 cars not yet heard from and upon receipt of account sales we will forward you our check in accordance with our agreement.

"Very truly yours,
"Crown Packing Company,
"By J. T. Bunn."

The "our check" so enclosed, reads in part as follows: "Thompson & Bunn . . . (Safety-Service - Secrecy) . . . Pay to the order of Z. Asamen $5167.49 . . . Thompson & Bunn, by J. T. Bunn." A second check in the sum of $818.27 was similarly signed and sent to Asamen. On July 21, 1939, Asamen received another letter signed "Crown Packing Company" in which was enclosed "our check" No. 192 stating that it was a full and final payment on the carrot deal which

read: "J. L. Thompson Company . . . Growers and Shippers, El Centro, California . . . Pay to the order of Z. Asamen $785.38 . . . J. L. Thompson Company, By J. T. Bunn." This check was refused by Asamen because of the condition attached that it was a payment in full.

Appellant Thompson testified that the Thompson & Bunn check above mentioned was drawn on a partnership account of theirs. Thompson had first denied that Bunn had any money in the J. L. Thompson account, but later testified that "if there was any money of J. T. Bunn's in there it was derived from joint venture or profits we might have"; that "the money that was deposited there was the last account sales of the carrot deal." In Thompson's deposition offered in evidence, he testified in response to the question: "On Mr. Bunn's funds and yours, you deposited in either account, it didn't make any difference? A. On what accounts do you refer? Q. On those carrot deals where the Crown Packing Company and Mr. Bunn were interested? A. There was no Crown Packing Company . . . no reason why I should put money in Crown Packing Company. Q. Did the Crown Packing Company put money in your accounts? A. No. . . . Q. Did you have a partnership with J. T. Bunn in 1939? A. I don't know whether you would call it a partnership. I considered it a joint venture. Q. What do you mean by a joint venture? A. We will look at a bunch of lettuce and put up an equal amount of money and we go 50-50 on it, 50 per cent of expenses and 50 per cent of the profits, and 50 per cent of the losses."

█ Omatsu was paid by Thompson and Bunn partnership checks. Eleven of them were placed in evidence and covered a period from February 3, 1939, to May 12, 1939. In this respect Thompson testified that "I don't recall whether I made any payments to him (Omatsu) after May, 1939. Evidence of a similar transaction in reference to the purchase of the carrots by the so-called Crown Packing Company was admitted in evidence wherein both Thompson and Bunn had previously negotiated a contract with a Mr. Roth under the name of Crown Packing Company and the produce was paid for by checks drawn on the Thompson and Bunn account. Appellants objected to the admission of this evidence. The evidence was admissible. (*Hoeft* v. *Hotchkiss*, 49 Cal.App. 773 [194 P. 509].) █ A partnership once shown to exist is presumed to continue until the contrary is shown, and the burden

of proof is upon him who asserts its termination. (*Nielson* v. *Gross,* 17 Cal.App. 74 [118 P. 725].) ■■■ The evidence is ample to support the implied finding of the jury that Thompson and Bunn were partners, actual as well as ostensible, and that as such they used the names of Thompson and Bunn, J. L. Thompson Company, and Crown Packing Company to carry on their partnership business with Asamen. (*Snavely* v. *Walls,* 13 Cal.App.2d 600 [57 P.2d 161] ; § 2410 Civ. Code; *Westcott* v. *Gilman,* 170 Cal. 562, 569 [150 P. 777, Ann.Cas. 1916E, 437] ; § 1963, subd. 29, Code Civ. Proc.) It sufficiently shows that the corporation was but an instrumentality for the transaction of the business of these defendants. ■ Under such circumstances they are held to the same rules of accountability as the corporation. (*Varni* v. *Angelo-American Land Co.,* 103 Cal.App. 326 [284 P. 520].) Where a corporation is but the instrumentality through which an individual, for convenience, transacts his business, all of the authorities hold such a corporation bound as the owner of the corporation might be bound, or conversely, hold the owner bound by the acts which would bind his corporation. (*Mirabito* v. *San Francisco Dairy Co.,* 8 Cal.App.2d 54 [47 P.2d 530] ; *Mervyn Inv. Co.* v. *Biber,* 184 Cal. 637 [194 P. 1037].)

■ It is appellants' next contention that respondent orally agreed, at the time of the execution of the written agreement, that all of the carrots packed would grade U. S. No. 1. Respondent denies such a contemporaneous oral agreement and claims that all of the defendants were continuously on the ground and examined the crop thoroughly; that he paid an inspector $15 per day and a federal state inspector $5.00 per car to inspect the carrots before shipment. Although there is considerable evidence that the carrots did not grade U. S. No. 1, there was no evidence that they were not marketable. There is nothing stated in the agreement that they were to be U. S. No. 1 grade. Defendants have been in the produce business for more than 20 years. They apparently knew more about merchandising carrots on the market than Asamen. They went over the fields, duly inspected the carrots and had them packed in their own way. They relied on their own judgment and skill in determining their marketability. It is apparent that they did not rely upon any representation made by Asamen. After they had examined them daily and after examining the reports of the inspectors, the carrots were not rejected by them. They were received, shipped and

sold all over the United States and brought a return of $22,-636.52. This evidence is sufficient to show that they were marketable. ■ Assuming the truth of appellants' contention that respondent guaranteed that the carrots would grade U. S. No. 1, the evidence discloses that the appellants had knowledge of the fact that the carrots did not meet the requirements of their alleged guarantee. This evidence, if believed by the jury, was sufficient to preclude appellants from prevailing in that defense. (*Streff* v. *Gold Medal Creamery Co.*, 96 Cal.App. 18, 22 [273 P. 831]; *Ehlers* v. *Bihn*, 71 Cal.App. 479 [235 P. 673]; *Union Oil Co.* v. *Purissima Hills Oil Co.*, 181 Cal. 479 [185 P. 381].) The contract as written and as interpreted by the jury was reasonable, and appears to be consistent with the intent of the parties making it. Appellate courts will not substitute another interpretation even though it may seem to be equally tenable. (*Tide Water Assoc. Oil Co.* v. *Curtin*, 41 Cal.App.2d 884 [107 P.2d 945].)

■ Appellants next contend that the record shows that Asamen had mortgaged the carrot crop to Fujimoto and that it was therefore incumbent upon respondent to have shown that the mortgage was paid in full in order that plaintiff could legally maintain this action. It is not surprising that appellants cite no authority in support of this contention. The cause of action was in the plaintiff either as principal or as agent. (*Earl Fruit Co.* v. *Herman*, 90 Cal.App. 640 [226 P. 592]; § 369 Code Civ. Proc.; *McIntyre* v. *Hicks*, 100 Cal.App. 531 [280 P. 543].)

Exceptions were taken to rulings of the court on the admissibility of certain evidence and the exclusion of other proffered evidence. We have examined the record and the rulings in reference thereto. No prejudicial error appears.

■ The respondent sought a judgment in the sum of $10,889.87. The evidence would have supported such a judgment in that amount. However, the jury found for respondent only in the sum of $7,250. Apparently the jury found in favor of the defendants, in part, as to the value, quantity or quality of the remaining carrots unharvested. The evidence supports the lesser amount found by the jury to be due respondent. Appellants cannot complain because the jury found in an amount less than that prayed for and established by the evidence. (*Lady* v. *Ruppe*, 113 Cal.App. 606 [298 P. 859].)

■ The final argument of appellants is deserving of more consideration. It is appellants' contention that the cross-complaint alleged that respondent was guilty of fraud and

misrepresentation as to the grade of carrots and that as a result thereof the carrots did not realize on the market a price sufficient to pay the packing and growing cost and that by reason thereof appellants were damaged in the sum of $5,000. The prayer of the cross-complaint seeks an *order reforming the instrument or agreement alleged in the complaint* to express the true intent and purpose of the parties as alleged in the cross-complaint and for such other and further relief as would be meet and proper in equity, together with a judgment in the sum of $5,000 as damages. A form of verdict was submitted to the jury reading in part as follows: "We, the jury . . . find for the defendant, Crown Packing Company, a corporation, and upon its cross-complaint and against the plaintiff and assess the damages . . . in the sum of $————." Another form was submitted and was adopted by the jury reading: "We, the jury . . . find for the plaintiff and against all of the defendants jointly and severally in the sum of $7,250.00 . . ." The jury returned no separate verdict as to the prayer contained in appellants' cross-complaint. The trial court made no findings upon the equitable relief sought in appellants' cross-complaint. Appellants moved the trial court for such a finding. This motion was denied. It is now argued that any verdict of the jury on the question as to whether the written agreement should be reformed in accordance with the prayer of the cross-complaint would have been only advisory and that any judgment based solely upon a general verdict such as was rendered in this case without being preceded by a finding and conclusion of law properly signed by the trial court would be premature and void as to that issue, citing *Brandt* v. *Wheaton,* 52 Cal. 430, 434; *Warring* v. *Freear,* 64 Cal. 54, 56 [28 P. 115].

■ The complaint sets forth an action at law on a common count for goods sold and delivered and for damages for breach of contract. Plaintiff was entitled to a jury as a matter of law. (§ 592 Code Civ. Proc.; *Kearney* v. *Bell,* 160 Cal. 661, 663 [117 P. 925]; *Fish* v. *Benson,* 71 Cal. 428 [12 P. 454].) Appellants' cross-complaint sought damages based upon respondent's claimed failure and neglect to cause the carrots to be harvested in a manner so that they would grade U. S. No. 1. The allegations of the so-called cross-complaint in this respect has more resemblance to a counterclaim. (*Union Oil Co.* v. *Purissima Hills Oil Co., supra; Luse* v.

*Peters,* 219 Cal. 625 [28 P.2d 357].) Had this been the only issue presented by the pleadings the general verdict of the jury would have disposed of that issue. No complaint was made at the time the verdict was read or received in reference to the failure of the jury to find on the issue of cross-complainant's claimed damages. Appellants cannot now be heard to complain that the verdict was only advisory in this respect and that the judgment on the general verdict was void as to this issue. (*Estate of Hellier,* 169 Cal. 77 [145 P. 1008]; *Joerger* v. *Pacific Gas & Electric Co.,* 207 Cal. 8, 20 [276 P. 1017].)

 It has been stated by the Supreme Court in many cases that when a defendant interposes equitable and legal defenses to the complaint, the proper rule of procedure for the court is to hear and dispose of the equitable defense before proceeding to try the issues of law. (*Arguello* v. *Edinger,* 10 Cal. 150, 160; *Estrada* v. *Murphy,* 19 Cal. 248, 273; *Weber* v. *Marshall,* 19 Cal. 447, 457; *Lestrade* v. *Barth,* 19 Cal. 660, 671; *Martin* v. *Zellerbach,* 38 Cal. 300, 319 [99 Am.Dec. 365]; *Fish* v. *Benson, supra.*) It may happen in many cases that the result of the trial of an equitable defense will obviate the necessity of a trial of the legal issues, and the trial may even dispose of all of the issues in the case, or the equitable relief granted may be such as to prevent the trial of the issues at law, but whenever the trial of the equitable defense does not have such result, and the issues at law remain undisposed of, these issues are to be tried in the same manner as though no equitable defense had been interposed.

In *Swasey* v. *Adair,* 88 Cal. 179 [25 P. 1119], it was said:

"It has never been held, however, that every defense of an equitable nature that may be interposed to an action at law must be heard and determined by the court before proceeding to try the issues at law. Such a rule of practice would, in many instances, be inconvenient, and would tend to embarrass rather than facilitate the trial of the cause. The cases in which the rule has been laid down were cases in ejectment in which the defendant asserted such a controlling equity as, if ripened into a decree, would prevent the plaintiff from asserting his legal claim. The equitable defense which is referred to in the rule is properly an equitable right of action existing in behalf of the defendant which he might have asserted in an independent suit brought by him against the plaintiff for the purpose of enforcing such right, but which

under our system he can also rely upon as a defense in an action involving the same subject-matter brought against him by the plaintiff. The party relying upon such equitable defense must, however, plead it with the same fullness and particularity as is required in cases involving like subjects of inquiry in suits in equity. His answer, being in the nature of a bill in equity, must contain all the essential averments of such a bill. He then becomes an actor with respect to the matters alleged by him, and his defense must be of such a character as may be ripened into a decree in his favor.'' (Citing cases.)

The question presented, therefore, is whether the cross-complaint in the instant action stated a cause of action in equity in reference to the prayer for reformation of the written agreement involved, so that it may be said that the jury and the trial court did not dispose of this equitable question. We therefore must inspect the cross-complaint to determine whether, under the foregoing principles, it stated a cause of ·action which would have justified the trial court in proceeding to try that issue in advance of the trial of the issues at law. Plaintiff and respondent's complaint sets up the original written agreement *in haec verba*. Appellants' answer, as distinguished from their cross-complaint, alleges, among other things, that ''with respect to the instrument set forth in plaintiff's amended complaint, it was the mutual agreement and understanding of the parties and the intention of each and both of the parties to said instrument that said instrument should express the oral agreement then and there made between the parties and that said instrument should be interpreted to mean and should mean as follows: That plaintiff was to furnish to the Crown Packing Company, a corporation, one hundred (100) carloads of U. S. No. 1 carrots to be sold by and through the Crown Packing Company, a corporation, as the selling agent at the best obtainable market price, the Crown Packing Company to have and receive as a selling commission ten per cent of the sales price, but with the understanding and agreement that said ten per cent commission should not apply until there had been received more than $1.05 per crate for said carrots. . . . That if the plaintiff did not so understand said instrument and did not intend the same to be so interpreted, then said plaintiff procured the execution thereof by the defendant Crown Packing Company through fraud and misrepresentation . . .''

The cross-complaint then follows and only alleges in this respect that "during the month of May, 1939, the plaintiff herein represented to the defendant, the Crown Packing Company, a corporation, that he owned or had under his control one hundred cars of carrots during the season of 1939, all of which said carrots would grade U. S. No. 1, and that the said plaintiff desired a sales agent for said carrots, and that the said plaintiff did cause said carrots to be harvested, hauled and packed and loaded on cars with the inspection certificate to be graded U. S. No. 1, and that the said defendant, the Crown Packing Company, did sell said cars of carrots, and that it was understood and agreed between the parties to said action that the said commission to the said Crown Packing Company should not apply until there had been received more than $1.05 per crate for said carrots, that is, if a crate of carrots sold for $1.10 the Crown Packing Company was to receive five cents upon its commission. If a crate of carrots sold for $1.15 the Crown Packing Company would receive ten cents on its commission. That if a crate of carrots sold, for $1.20, or higher, the Crown Packing Company would receive ten per cent of the sale price.''

Appellants then prayed "that the plaintiff take nothing by his action; that an order be entered herein reforming said instrument to express the true intent and purpose between the parties." If we examine the cross-complaint without the aid of or reference to plaintiff's amended complaint or the answer of appellants, the cross-complaint does not state a cause of action. Appellants failed to set up in the cross-complaint *in haec verba*, or otherwise, the written agreement as originally executed, or its contents, and failed to allege therein the allegations set forth in the answer respecting the claimed mutual mistake and intention of the parties or the agreement claimed to have been executed as intended by them. This would have been a necessary part of any pleading which sought to reform that instrument. █ The inclusion of such original agreement in the cross-complaint by reference to plaintiff's pleadings is not allowable. (*Coulthurst* v. *Coulthurst*, 58 Cal. 239; *Collins* v. *Bartlett*, 44 Cal. 371, 381; *Kreichbaum* v. *Melton*, 49 Cal. 50, 55; *Haskell* v. *Haskell*, 54 Cal. 262.) A cross-complaint is a pleading separate and apart from the answer, and is required to be complete and sufficient in itself. It cannot be aided by averments of the answer. (*Luse* v. *Peters, supra.*) █ From the above-cited authori-

ties it is apparent that the cross-complaint did not state an equitable cause of action.

For the reasons expressed, the judgment should be and is affirmed.

Barnard, P. J., and Marks, J., concurred.