[Civ. No. 9772.   Third Dist.   Apr. 25, 1960.]

WESLEY TEMPLE et al., Respondents, v. BODEGA BAY FISHERIES, INC. (a Corporation) et al., Defendants; I. ALIOTO et al., Appellants.

Joseph L. Alioto and Walter F. Calcagno for Appellants.

Geary, Spridgen & Moskowitz and Alfred F. Maggini for Respondents.

VAN DYKE, P. J.—This is an appeal from money judgment rendered in an action by creditors of Bodega Fisheries, Inc., a corporation, against that corporation and several individuals and another corporation. The court found that Bodega Fisheries, Inc., a corporation, hereinafter called "Bodega" was the *alter ego* of the other defendants and that they were responsible for its debts. The sole question presented by the appeal is whether or not the facts presented a proper case for the application of the *alter ego* doctrine.

I. Alioto and his wife, she not being a defendant here, were the owners of real property on Bodega Bay in Sonoma County. Upon this property there had been constructed buildings suitable for conducting the business of processing and packing seafood products. Some of the buildings were owned by Mr. and Mrs. Alioto and some were owned by defendant Consolidated Fisheries, Inc., a corporation, hereinafter called "Consolidated." Within these structures there had been installed necessary equipment, some of which Consolidated owned. For years Consolidated had conducted a business of processing and packaging seafoods purchased from fishermen. Its stock was owned two-thirds by I. Alioto and one-third by Sal Alioto, his brother. Sal was an officer and the manager of Consolidated. Among the structures on the Alioto property was also a small restaurant which for years had been operated by a Mr. and Mrs. Kennison on a basis whereby they paid over to Consolidated one-half of the net profits of the restaurant business.

In late January or early February, 1956, defendant Frank Lucido, on the basis of a report that I. Alioto wanted to sell his interests at Bodega Bay, approached him as one authorized to offer a price therefor. I. Alioto told him he did not want to sell, but would be willing to talk with him at a future time. Shortly thereafter there was a meeting in San Francisco between Lucido, I. Alioto, his brother Sal, a Mr. Hubbard who was employed by the Alioto interests as an accountant, and an attorney representing the same interests. An understanding was reached between those attending the meeting, which we shall call the preorganization meeting, that Lucido would terminate his existing employment; that a corporation

would be formed to be known as Bodega Fisheries, Inc.; that I. Alioto would own one-half of its stock and Sal Alioto and Lucido would each own one-fourth of its stock; that I. Alioto would pay for his stock, but that Lucido's stock would be issued and be paid for out of profits accruing to him from the operation of the business; that for five years Lucido would be the general manager of Bodega and would receive a salary of $125 per week; that his wife would receive $65 per week; that Hubbard's salary should be $100 a month and that Lucido's son would be paid $85 per week. It was further agreed that the buildings and equipment being used by Consolidated would be repaired and augmented, with the idea of doing a larger business than Consolidated had been doing; that when this had been done and Bodega was ready to operate, Consolidated would cease to operate at Bodega Bay; that the two corporations would not compete, but that Consolidated could purchase seafood products prepared by Bodega. It was estimated that some $15,000 would be expended in getting Bodega ready to begin doing business. Actually the sum turned out to be nearer $18,000. Prior to the incorporation of Bodega and pursuant to the understanding at the preorganization meeting, the repair and augmentation of the structures and equipment Consolidated had used was begun and funds for that purpose were furnished by I. Alioto. He first advanced $5,000 and then a second $5,000. With this money and partly upon credit, Lucido proceeded to repair the existing buildings, repair equipment, purchase and install new equipment and add additional buildings. While this was going on articles of incorporation were obtained for Bodega and application was made for the issuance of its stock for cash. There was issued to I. Alioto for the $10,000 he had advanced a certificate of stock for 1,000 shares. Two certificates were made out, one to Sal Alioto and one to Lucido for 500 shares each, but they were never issued and remained in the stock book not detached from the certificate stubs. Neither Sal Alioto nor Lucido paid any money for stock and Lucido took the position that under the preorganization agreement he did not have to pay for his stock except from profits of the business. The fishing season began May 1, 1956, and Bodega was without funds to begin to operate. I. Alioto advanced another $5,000, to enable it to begin buying, and received the corporation's note therefor. That note has never been paid. Additional operating funds were obtained from

Consolidated as prepayment for seafood products to be delivered, and generally its advances have not been repaid. By September 1st the balance stood at nearly $9,000 in favor of Consolidated. In addition, Bodega owed other creditors and in large part the plaintiffs in this action were those who furnished the labor and materials that had been used in improving the facilities, as hereinbefore related. By September 1st Bodega was in need of operating funds and funds with which to pay accumulated debts. The Aliotos and Lucido discussed the situation, Lucido contending that the business could be made to prosper. I. Alioto asked Lucido and his brother Sal, if either of them had any money to put in, and on receiving a negative reply announced that it was time to "go broke." Lucido refused to accede and he and his family continued to operate for some time. It was his testimony that friendly relations between himself and the Aliotos had broken down and that they no longer cooperated in an attempt to continue the business. It is unnecessary to trace further the history of Bodega. Its condition steadily worsened. Mr. and Mrs. I. Alioto finally brought eviction proceedings and succeeded in recovering possession of the land and buildings upon which the business had been conducted. At no time did Bodega have a written lease with either Consolidated for the use of its buildings and equipment or with Mr. and Mrs. Alioto for the use of their buildings and land. After things began to go bad, rental demands were made and not met. The Kennisons had continued to operate the restaurant in a newly constructed and furnished restaurant which had been part of the augmentation and restoration work of Bodega. They had paid some rent under the profit-sharing plan until they ceased to pay because of the breakdown of friendly relations between Lucido, Bodega, and the Alioto interests, including Consolidated.

The situation presented by the evidence supports the trial court's application of the *alter ego* doctrine as to Lucido, I. and Sal Alioto, and Consolidated. Although there was reflected in the corporation books a first meeting of the directors, no other corporate meeting had ever been held and the minute book reflected none. Although I. Alioto had received a thousand share certificate of Bodega stock, it had been issued for moneys expended in augmentation and restoration work done partly before and partly after the organization of Bodega. Sal Alioto had never paid for any stock nor had Lucido, who claimed an agreement for the purchase of stock in violation

of the terms of the permit issued. Bodega had been under-financed from the start and it could be fairly said that it had never been made solvent by its organizers. The money for which its stock had been issued had been expended on improvements on the land owned by Mr. and Mrs. Alioto, in the repair of equipment owned by Consolidated, in new building construction on the Alioto land and in the purchase of new equipment owned by Bodega, but installed in buildings on the Alioto land. Although Bodega stock had been issued, its funds were so expended that what they paid for was for all practical purposes unavailable to general creditors. In short, the true picture of this business operation justified the court in finding that there had never been the organization and operation of a true corporate enterprise and that as a result of what was done it would be inequitable to permit the operators of the business, that is, Lucido, I. and Sal Alioto and through them Consolidated to take refuge behind the corporate form. ■■ The conditions for the application of the doctrine of *alter ego* have been well and sufficiently stated in numerous decisions of the appellate courts of this state and it will suffice as authority for what has been here held to quote the statement of that doctrine found in *Minifie* v. *Rowley*, 187 Cal. 481, 487 [202 P. 673], as follows:

"Before the acts and obligations of a corporation can be legally recognized as those of a particular person, and *vice versa,* the following combination of circumstances must be made to appear: First, that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased; second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice."

In this case particular weight must be attached to the fact that the organizers of Bodega never provided a sound financial basis for the business they operated under that corporate form. ■■ As said in *Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796-797 [306 P.2d 1, 63 A.L.R.2d 1042]:

"Another factor to be considered in determining whether individuals dealing through a corporation should be held personally responsible for the corporate obligations is whether

there was an attempt to provide adequate capitalization for the corporation. In Ballantine on Corporations (rev. ed., 1946), at pages 302-303, it is stated: 'If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' "

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 22, 1960.