[Civ. No. 20302. First Dist., Div. One. Dec. 17, 1962.]

ASSOCIATED VENDORS, INC., Plaintiff and Appellant, v. OAKLAND MEAT CO., INC. et al., Defendants and Respondents.

Robert C. Burnstein and Sandra J. Shapiro for Plaintiff and Appellant.

Connella, Sherburne & Myers and E. Conrad Connella for Defendants and Respondents.

MOLINARI, J.—Appellant, Associated Vendors, Inc., brought this action against respondents Oakland Meat Co., Inc., (hereinafter referred to as Meat Co.) Oakland Meat & Packing Co., (hereinafter referred to as Packing Co.), and several individuals, to collect unpaid rental on property leased by appellant to respondent Packing Co., and to recover the difference between the rental provided in the lease with Packing Co. and the rental now being paid by a new tenant. Appellant alleged that, upon Packing Co.'s default in payment of rent and vacation of the premises, appellant relet the premises to one Frank H. Black, on Packing Co.'s behalf, at a monthly rental which was less than the rental Packing Co. was obligated to pay under the terms of the lease. Appellant sought to impose liability upon the Meat Co. and the individuals on the theory that Packing Co., the lessee under the lease, was the *alter ego* of the other respondents. Appellant also sought attorney's fees and an injunction against respondents restraining them from selling or otherwise transferring certain obligations incurred by Frank H. Black.

Following a trial on the merits, the court found in favor of appellant as against Packing Co., and in favor of the other defendants to the action. Appellant appeals from the judgment.

The sole issue on appeal is whether the trial court erred in holding that Packing Co. was not the *alter ego* of respondents.

## Statement of Facts

The appellant, as lessor, leases market space in the Housewives Market in Oakland. In November 1956, one of the appellant's tenants, Clarence Klieman, went into bankruptcy. The appellant thereupon entered into the negotiations hereinafter set forth for a lease of the premises formerly occupied by Klieman. At the time of said negotiations Meat Co. was an established meat wholesaler. The directors and officers of Meat Co. were Zaharis, Lafayette, White and Frueh. Zaharis was its president and the owner of 26 per cent of its stock. He had been an officer, director and shareholder since it was formed. Lafayette owned 26 per cent of the stock, while White and Frueh owned 24 per cent each. The preliminary negotiations for said lease were held at a meeting in November of 1956.

Allan Schulman, president of the appellant corporation, testified concerning said meeting as follows: that he, in his then capacity as secretary-treasurer of appellant, and Phil Davidson, one of its directors, met with respondents, Zaharis and Lafayette, at the office of Meat Co. to discuss the possible lease to Meat Co. of the meat department premises formerly occupied by Klieman; that Zaharis and Lafayette stated to him that "they" wanted to lease said department in order to recoup certain losses which they had sustained in sales of meat to Klieman; that he (Schulman) stated the rent would be $3,000 for the first month, and $1,500 every month thereafter, for a term of eight years; that he further stated that $4,500 was to be paid in advance, $1,500 thereof being lease security; and that no mention was made of the name of the person who would appear as lessee on the lease. Davidson's testimony regarding this meeting was substantially the same as Schulman's. He testified that at said meeting there was no mention of a lease to anyone other than Meat Co., and that he was of the opinion, then, that Associated Vendors was dealing with Meat Co.

Zaharis testified as follows with reference to the said meeting: That it was held on November 20, 1956, in Davidson's office, and not at that of the Meat Co.; that present, besides himself, were Davidson, Klieman, and Arthur Weikert. (Weikert was General Manager of the market.) That there never was any meeting between Schulman, Davidson, Lafayette

and himself; that at said meeting he (Zaharis) stated that he was interested in purchasing the fixtures which were being foreclosed, running the retail business, and signing a lease, providing the officers of Meat Co., who were meeting the next day, were interested; that he "was not interested in personal liability" and that he asked Weikert and Davidson if he "could use the name Housewives Meat Company for the new business as a new corporation"; that they said "no, it was too similar to the Housewives Market," and that then he (Zaharis) stated: " 'If you are interested in me signing a lease it will have to be a separate corporation.' " Zaharis testified further as to the terms of the proposed lease. (These were the same as those specified above by Schulman.) Lafayette denied being present at any such meeting.

Klieman testified that such a meeting was held, and that present were the same persons mentioned by Zaharis. Klieman testified further that at this meeting Zaharis stated that "he would have to have a new corporation because he wanted no personal liability on himself" or the Meat Co. Weikert denied being present at the meeting and stated that he did not meet Zaharis until 1959.

The evidence discloses that contemporaneously with these negotiations Zaharis had been in contact with a Mr. Stanley Whitney concerning the acquisition of a corporation known as Town & Country Farms, which was organized for the purpose of developing real estate, had not issued any stock and had never commenced doing any business. Whitney was the attorney for said corporation and pursuant to negotiations with Zaharis undertook to amend the articles and certificate of said corporation by changing its name to Oakland Meat & Packing Company (referred to herein as Packing Co.).

Zaharis testified, further, that the day after the aforesaid meeting, Weikert phoned him for "his answer"; that he told Weikert he "personally was interested in it" and that he "told them that if they wanted me to form a new corporation, sign the lease, that I wanted no personal liability, I would be glad to do it"; that Weikert said he would discuss it with the officials of appellant, and that if they agreed that they would make a lease and bring it to him; that a "day or two after the market was opened" he received another telephone call from Weikert wherein Weikert stated that "the officials of the corporation at the Housewives Market was interested in getting the lease signed because we were operating with-

out a lease"; that he replied that he "couldn't sign the lease until the corporation papers were back from Sacramento"; that a similar conversation was had one or two days later; and that the day following the last conversation the papers were obtained. Zaharis also testified that "we were operating for two or three days before there was a lease signed."

Copies of the lease in question had, in the meantime, been prepared by Robert C. Burnstein, attorney for appellant, who forwarded them to Whitney with a letter of transmittal specifically requesting that the lease be signed by an authorized officer of Packing Co. and that the seal of said corporation be impressed upon it. Whitney had continued to act as attorney for Packing Co., and upon the change of name becoming effective, proceeded to make application for a permit to issue stock under the new name. Both copies of the lease were subsequently signed in Whitney's office by Zaharis and White as president and secretary-treasurer, respectively, of Packing Co. and its seal was affixed thereto. Whitney then brought both copies of the lease, together with Packing Co.'s check for $4,500 representing the first month's rent and the security deposit, to the appellant's premises where they were signed by two officers of the appellant. The said lease designates the appellant as lessor and Packing Co. as lessee, and bears an execution date of December 3, 1956.

Whitney testified that he never represented Meat Co. and did not know of its existence until the time he was engaged to effect the said change of name. After the lease was signed, Whitney negotiated on behalf of Packing Co. for the purchase of certain fixtures from a certain Al Weikert (brother of the Weikert hereinbefore referred to). A conditional sales contract was entered into between said Al Weikert, as seller, and Packing Co., as purchaser. This contract was signed by Zaharis and White in their capacities as officers of Packing Co. Whitney testified that when he delivered the contract to Al Weikert it bore these signatures and Packing Co.'s seal. The terms of said contract provided for a down payment of $1,032.89, and a time balance of $14,787.08.

Pursuant to a permit for the issuance of stock, Zaharis became the sole shareholder of Packing Co. by the acquisition of 80 shares of its stock for which he paid $8,000. A certificate for said stock to Zaharis was issued on April 24, 1957. The officers and directors of Packing Co. were Zaharis, White and Frueh. Zaharis was elected its president. According

to the testimony of both Zaharis and Lafayette the latter was not in any way affiliated with Packing Co.

Schulman testified, further, that at the time said lease was being negotiated he was familiar with Meat Co.; that it had a good reputation and credit; and that he had not heard that a new company was being organized. He testified that he first heard of Packing Co. in November of 1958, and that prior to that time he did not know that there was a difference between Meat Co. and Packing Co., and that although he knew the lease was in Packing Co.'s name he did not know that this identified an organization separate from Meat Co. He also testified that he never saw a Packing Co. sign on the market premises.

Zaharis' total investment in Packing Co. was the $8,000 which he paid for the corporate stock. He withdrew $6,000 to $7,000 from Meat Co. These were personal funds and not company funds. Of the said sum of $8,000, the sum of $4,500 was used to pay the first month's rent and the lease deposit to appellant, the sum of $1,032.89 was used as a down payment on the fixtures, and the sum of $700 was paid as the first installment under the fixture conditional sale contract. When Packing Co. began business operations it had about $1,500 in cash. It had acquired on credit an opening inventory valued at between $2,000 and 3,000. The monthly rental was $1,500, the installment payment on the fixtures $700, and the weekly payroll was $893.67. The equipment in the shop belonged to the Trustee in Bankruptcy who permitted Packing Co. to use it pending the bankruptcy sale. The fixtures which were purchased for approximately $16,000 were valued by Zaharis at $60,000 in place, less than $50,000 if not installed. They were subsequently sold for $9,000.

About three months after the commencement of business Packing Co. was in need of funds. The sum of $3,500 was required to purchase the equipment from the trustee. Zaharis loaned $5,000 to the Packing Co. There are no minutes and no vote evidencing the transaction. A year later Zaharis needed the $5,000 for another venture. Packing Co. did not have the money to repay the loan, so a loan of $5,000 was made by Meat Co. to Packing Co. in order to repay Zaharis. This was the only loan ever made by Meat Co. to Packing Co. A chattel mortgage upon Packing Co.'s equity in the fixtures was executed on May 26, 1958, but was not recorded until December 17, 1958. This loan has not been repaid, nor has

Meat Co. made a demand for its payment. Zaharis did not make any other loans to Packing Co., nor did he pay any of its bills.

During Packing Co.'s business operations, Meat Co. advanced credit to Packing Co. Meat Co., however, was only one of several suppliers who continued to supply on credit. Packing Co.'s purchases amounted to approximately $25,000 per month. From 60 per cent to 70 per cent of such merchandise was procured from suppliers other than Meat Co. No price advantage was given or received by Meat Co. When Packing Co. vacated the leased premises it still owed Meat Co. about $15,000. This debt has not been paid nor have any arrangements been made for repayment. Zaharis testified: that this bill was not paid because the other creditors were paid in preference to Meat Co.; that he had guaranteed all other companies that there was no connection between the two companies; that he did not want to be responsible for owing any creditor any money; that he wanted to take the loss if any should arise; and that he wanted to protect his reputation. Lafayette testified: that Meat Co. did not intend to sue Packing Co. for this indebtedness because Packing Co. has no assets; that a suit would be worthless; and that the obligation would be merely written off. Packing Co. has paid all of its other obligations, bills and all of the rent up to the time it ceased doing business in January 1959.

Zaharis, White and Frueh rendered services to Packing Co. without compensation. They did, however, continue to receive their regular compensation from Meat Co. Zaharis testified that he devoted all of his time to Meat Co., and that his participation in the management of Packing Co. consisted of telephoning the manager of the market two or three times a day. Lafayette acted gratuitously as a business advisor and on occasion examined Packing Co.'s books. Lafayette testified, however, that he did not do any work on Packing Co.'s books, nor did he sign any of its checks. On occasion Lafayette would pick up the cash from the retail market.

Other than its retail activities in the Housewives Market, Packing Co. did not maintain an office. Its books were kept at the Meat Co.'s address, and its bookkeeper worked on Packing Co.'s books at the Meat Co.'s office. Most of Packing Co.'s mail was addressed to the retail premises, but on occasion some of it was addressed to the Meat Co.'s office.

On one occasion a letter was addressed to Meat Co., "attention Mr. Lafayette," concerning an employee of Packing Co. There was testimony that certain bills were addressed to Meat Co. for items properly concerning Packing Co. The Packing Co. had a separate telephone at the retail outlet but did not have a phone at the Meat Co. office. Mail arriving at the Meat Co.'s office would be opened by the same person, a Miss Duarte, whether addressed to Meat Co. or to Packing Co. Miss Duarte acted as bookkeeper for Packing Co. part of the time and for Meat Co. the rest of the time. There was testimony concerning the approval of bills received through the mail at Meat Co.'s office. Because some of the officers acted in an official capacity for both companies the persons who would approve paying the bills were often the same regardless of which company paid the bill. Packing Co.'s bills were mailed from Meat Co.'s office, and all of said company's bills were paid from that office by said bookkeeper. All payments and all disbursements of Packing Co., including rent to appellant, were made upon its own checks and from its own bank accounts.

The licenses and permits permitting Packing Co. to operate a retail meat business bore the name "Oakland Meat Company." These licenses and permits were posted in a conspicuous place by the manager. City license notices were sent to "Oakland Meat Company, Housewives Market." The fees, however, were paid for by Packing Co. Zaharis testified that he had not seen the licenses and permits, and that the name "Oakland Meat" was put thereon without his permission. He also stated that this name was an abbreviation of Packing Co.'s name. The union contract covering Packing Co.'s retail employees only showed the name "Oakland Meat" as employer and was signed by Crowell, the manager of the retail department. Zaharis testified he had never seen a copy of this contract and that it should have shown Packing Co.'s name as the employer. A union representative testified that retail butcher complaints and wage claims were taken up with Lafayette. Separate workmen's compensation and fire policies were carried by Packing Co. in its own name, but the public liability and property damage insurance coverage for Packing Co. was added to Meat Co.'s policy. The insurance broker testified that this was done at the suggestion of the insurance company because the identity of the individuals exposed to liability, with the exception of Lafayette,

was the same; that it was more expedient to have the coverage with one company, and also that there would be a saving in premiums. On occasion Meat Co.'s automobiles were used by Packing Co. Zaharis stated that this was done as a favor.

Zaharis also testified as to his credit, stating he could get several thousand dollars worth of meat on the signature of an employee in the market. He stated further that the sum of $1,000 to $1,500 together with the cash intake of $25,000 per month was adequate to operate the market for a month. It was his testimony that the market had brought in about $25,000 per month prior to Packing Co. taking over, and that while Packing Co. was operating the retail market it brought in from $6,000 to $7,000 per week. Several wholesalers' representatives testified that credit was extended to Packing Co. because they relied on Zaharis' personal credit and integrity and upon the standing of Meat Co. in the meat industry.

A Mr. Pitcher testified that he sold and serviced equipment at the retail premises from time to time; that he billed Meat Co.; and was never informed that the bill was directed to the wrong company. He testified further that he was told by a butcher at the retail market to deliver the merchandise there, but to send the bill to the Meat Co. Pitcher stated that he didn't know there was any difference between Meat Co. and Packing Co., and that he didn't realize that they were two different companies. He stated further that he did work for both the Meat Co. and Packing Co. and testified that certain invoices for merchandise delivered to and work done at the retail market were paid for by Packing Co. checks.

Other testimony was adduced from several persons who dealt with Packing Co. showing that some confused the names of the two corporations. A Mr. Pariani testified that he charged meat delivered to the retail store to Packing Co. but invoiced it to "Oakland Meat." Pariani, however, testified that he knew of the existence of the two companies; that he dealt with both of them; and that each had a separate account number. Mr. Egland, a representative of Swift & Company, stated that meat delivered to Packing Co. was billed to "Oakland Meat Company," but he also testified Swift sold meat to both companies; that he was aware of the existence of the two companies at the different addresses, and the different nature of the two companies. A Joseph Thelen testified that the records of his company (Lewis &

McDermott, Inc.) listed the name of "Oakland Meat Co." rather than Oakland Meat & Packing Co., but that it was a result of laxity or brevity, stating: "We knew it wasn't the same company." Thelen testified further that his company dealt with both corporations; that he knew they were separate corporations; and that separate ledger sheets were kept for each. A Mr. Vignaux of Victor Meat Corporation dealt with both companies and maintained separate accounts, listing each company by its proper name. There was also testimony to the effect that when a Pierce Packing Company billed Meat Co. for Packing Co.'s meat, Meat Co. (through Mr. Frueh) objected to this procedure to Guidoni, the manager of the retail outlet. The record contains further evidence, mostly repetitious, which gives conflicting impressions on the unity or separateness of the two corporations. There was also evidence of billings properly made, and testimony that, irrespective of the manner of billing, the disbursements for Packing Co.'s bills were on Packing Co's checks.

There was also evidence presented that Packing Co. and Meat Co. kept separate bank accounts, separate sets of accounts, made separate disbursements, using checks bearing the individual company name; maintained separate payrolls; that the companies used different fiscal years for tax purposes; that they were represented by different counsel; and that they maintained separate minutes.

### The Trial Court's Findings

There is substantial evidence contained in the record to uphold the findings of the trial court under the time honored rule that on appeal all conflicts in the evidence must be resolved in favor of the respondent, and that all legitimate and reasonable inferences will be indulged in to uphold the findings of the trial court. It is an elementary principle of law that the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trial judge. *(Thayer* v. *Pacific Elec. Ry. Co.,* 55 Cal.2d 430, 438 [11 Cal.Rptr. 560, 360 P.2d 56]; *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]; *Wade* v. *Campbell,* 200 Cal.App.2d 54, 63 [19 Cal.Rptr. 173].) The appellant, in its briefs, acknowledges that any conflicts in the evidence must be resolved in favor of respondents and therefore states that it

sets forth only the undisputed testimony in its statement of facts because it feels that this undisputed testimony alone is sufficient to compel reversal of the judgment below. What the appellant overlooks is that this ''undisputed testimony'' may not be considered to the utter disregard of disputed testimony which favors respondents. The appellant's statement of facts presents a case upon which a trial court *might* decide to pierce the corporate veil, but looking to all of the facts, which we have narrated above, it is another matter to say that under these facts the corporate veil must be pierced.

The essence of the trial court's findings is that Packing Co. is a separate and distinct entity from Meat Co.; that it was not organized by any of the respondents; that it has never been the *alter ego* of any of the respondents or used by them to operate any of their businesses under other than their own names; that there was no confusion between the two corporations and their affairs were conducted separately; that there was no commingling of Packing Co.'s funds with those of Meat Co. or the individual respondents; and that Packing Co. was adequately capitalized in relation to the reasonable requirements of its business and corporate purposes.

The appellant does not attack any specific finding of the trial court but contends not only that the uncontroverted evidence discloses factors which *require* that the corporate entity be disregarded, but that the two elements of unity of ownership and inequity are so *conclusively present* as to compel the disregard of such entity. The appellant further asserts that Packing Co. was under-capitalized as a matter of law and that this factor is sufficient in itself to warrant a disregard of the corporate entity. In attempting to sustain its position the appellant relies, generally, upon appellate decisions which have upheld judgments disregarding the corporate entity where the factual situation presented supplied factors which *allowed* the trial court to arrive at that conclusion.

### *Did the Trial Court Err in Refusing to Disregard the Corporate Entity?*

It is a fundamental rule that ''[t]he conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders,

necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court. Only general rules may be laid down for guidance.'' *(Stark* v. *Coker,* 20 Cal.2d 839, 846 [129 P.2d 390]; *H.A.S. Loan Service, Inc.* v. *McColgan,* 21 Cal.2d 518, 523 [133 P.2d 391, 145 A.L.R. 349]; *Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1].) ▮ The basic rule stated by our Supreme Court as a guide in the application of this doctrine is as follows: The two requirements are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. *(Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d 792, 796; *Stark* v. *Coker, supra,* 20 Cal.2d 839, 846; *Watson* v. *Commonwealth Ins. Co.,* 8 Cal.2d 61, 68 [63 P.2d 295]; *Minifie* v. *Rowley,* 187 Cal. 481, 487 [202 P. 673].) With respect to the second requirement, it is sufficient that it appear that recognition of the acts as those of a corporation only will produce inequitable results. *(Stark* v. *Coker, supra,* p. 846; *Watson* v. *Commonwealth Ins. Co., supra,* p. 68.) ▮ The general rule is thus stated as follows: '' 'Before a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.' '' *(Talbot* v. *Fresno-Pacific Corp.,* 181 Cal.App.2d 425, 431 [5 Cal.Rptr. 361]; *Temple* v. *Bodega Bay Fisheries, Inc.,* 180 Cal.App.2d 279, 283 [4 Cal.Rptr. 300].)

The gist of the cases which have considered the doctrine is that *both* of these requirements must be found to exist before the corporate existence will be disregarded; that such determination is primarily one for the trial court and is not a question of law; and that the conclusion of the trier of fact will not be disturbed if it be supported by substantial evidence. (See also *H.A.S. Loan Service, Inc.* v. *McColgan, supra,* 21 Cal. 2d 518, 524; *Kasutoff* v. *Wahlstrom,* 196 Cal.App.2d 65, 69

[16 Cal.Rptr. 207] ; *Talbot* v. *Fresno-Pacific Corp., supra,* 181 Cal.App.2d 425, 432; *Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482, 492 [197 P.2d 167].) It should also be noted that, while the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished. Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity. (See *Talbot* v. *Fresno-Pacific Corp., supra,* 181 Cal.App.2d 425, 431; *Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service, Inc.,* 217 Cal. 124, 129 [17 P.2d 709] ; *Carlesimo* v. *Schwebel, supra,* 87 Cal.App.2d 482, 491; *Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 P. 641].)

A review of the cases which have discussed the problem discloses the consideration of a variety of factors which were pertinent to the trial court's determination under the particular circumstances of each case. Among these are the following: Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses (*Riddle* v. *Leuschner,* 51 Cal.2d 574 [335 P.2d 107] ; *Talbot* v. *Fresno-Pacific Corp., supra,* p. 431; *Thomson* v. *L. C. Roney & Co.,* 112 Cal.App.2d 420 [246 P.2d 1017] ; *Asamen* v. *Thompson,* 55 Cal.App.2d 661 [131 P.2d 841] ; *Goldberg* v. *Engelberg,* 34 Cal.App.2d 10 [92 P.2d 935] ; *Sweet* v. *Watson's Nursery,* 33 Cal.App.2d 699 [92 P.2d 812] ) ; the treatment by an individual of the assets of the corporation as his own (*Minton* v. *Cavaney,* 56 Cal.2d 576 [15 Cal.Rptr. 641, 364 P.2d 473] ; *Thomson* v. *L. C. Roney & Co., supra; Riddle* v. *Leuschner, supra*) ; the failure to obtain authority to issue stock or to subscribe to or issue the same (*Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d 792; *Wheeler* v. *Superior Mortgage Co.,* 196 Cal.App.2d 822 [17 Cal.Rptr. 291] ; *Marr* v. *Postal Union Life Ins. Co.,* 40 Cal.App.2d 673 [105 P.2d 649] ; *Claremont Press Pub. Co.* v. *Barksdale,* 187 Cal. App.2d 813 [10 Cal.Rptr. 214] ; *Engineering etc. Corp.* v. *Longridge Inv Co.,* 153 Cal.App.2d 404 [314 P.2d 563] ; *Shafford* v. *Otto Sales Co., Inc.,* 149 Cal.App.2d 428 [308 P.2d 428] ) ; the holding out by an individual that he is personally liable for the debts of the corporation (*Stark* v. *Coker, supra,* 20 Cal.2d 839; *Shafford* v. *Otto Sales Co., Inc., supra*) ; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities

(*Riddle* v. *Leuschner, supra,* 51 Cal.2d 574; *Stark* v. *Coker, supra*; *Temple* v. *Bodega Bay Fisheries, Inc., supra,* 180 Cal. App.2d 279; *Shafford* v. *Otto Sales Co., Inc., supra*); the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family (*Riddle* v. *Leuschner, supra*; *Stark* v. *Coker, supra*; *McCombs* v. *Rudman,* 197 Cal.App.2d 46 [17 Cal.Rptr. 351]; *Talbot* v. *Fresno-Pacific Corp., supra,* 181 Cal.App.2d 425; *Claremont Press Pub. Co.* v. *Barksdale, supra,* 187 Cal.App.2d 813; *Thomson* v. *L. C. Roney Co., supra,* 112 Cal.App.2d 420; *Asamen* v *Thompson, supra,* 55 Cal.App.2d 661; *Sweet* v. *Watson's Nursery, supra,* 33 Cal.App.2d 699; *Goldberg* v. *Engleberg, supra,* 34 Cal.App.2d 10; *Gordon* v. *Aztec Brewing Co.,* 33 Cal. 2d 514 [203 P.2d 522]; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc.,* 166 Cal.App.2d 652 [333 P.2d 802]; *Shea* v. *Leonis,* 14 Cal.2d 666 [96 P.2d 332]); the use of the same office or business location; the employment of the same employees and/or attorney (*McCombs* v. *Rudman, supra*; *Talbot* v. *Fresno-Pacific Corp., supra*; *Thomson* v. *L. C. Roney Co., supra*; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc., supra*); the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization (*Minton* v. *Cavaney, supra,* 56 Cal.2d 576; *Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d 792; *Stark* v. *Coker, supra,* 20 Cal.2d 839; *Talbot* v. *Fresno-Pacific Corp., supra,* 181 Cal.App.2d 425; *Temple* v. *Bodega Bay Fisheries, Inc., supra,* 180 Cal.App.2d 279; *Wheeler* v. *Superior Mortgage Co., supra,* 196 Cal.App.2d 822; *Claremont Press Pub. Co.* v. *Barksdale, supra,* 187 Cal.App.2d 813; *Engineering etc. Corp.* v. *Longridge Inv. Co., supra,* 153 Cal.App.2d 404; *Shafford* v. *Otto Sales Co., Inc., supra,* 149 Cal.App.2d 428; *Shea* v. *Leonis, supra,* 14 Cal.2d 666; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc., supra,* 166 Cal.App.2d 652); the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation (*McCombs* v. *Rudman, supra,* 197 Cal.App.2d 46; *Asamen* v. *Thompson, supra,* 55 Cal.App.2d 661; *Engineering etc. Corp.* v. *Longridge Inv. Co., supra*; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc., supra*); the concealment and

misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities (*Riddle* v. *Leuschner, supra,* 51 Cal.2d 574; *Shafford* v. *Otto Sales Co., Inc., supra*) ; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities (*Riddle* v. *Leuschner, supra,* 51 Cal.2d 574; *McCombs* v. *Rudman, supra*; *Wheeler* v. *Superior Mortgage Co., supra*; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc., supra*) ; the use of the corporate entity to procure labor, services or merchandise for another person or entity (*Temple* v. *Bodega Bay Fisheries, Inc., supra*; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc., supra*; *Engineering etc. Corp.* v. *Longridge Inv. Co., supra*) ; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another (*Riddle* v. *Leuschner, supra,* 51 Cal.2d 574; *Thomson* v. *L. C. Roney Co., supra,* 112 Cal.App.2d 420; *Sweet* v. *Watson's Nursery, supra,* 33 Cal.App.2d 699; *Talbot* v. *Fresno-Pacific Corp., supra,* 181 Cal.App.2d 425) ; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions (*Wheeler* v. *Superior Mortgage Co., supra,* 196 Cal.App.2d 822; *Claremont Press Pub. Co.* v. *Barksdale, supra,* 187 Cal.App.2d 813; *Shafford* v. *Otto Sales Co., Inc., supra,* 149 Cal.App.2d 428; *Asamen* v. *Thompson, supra,* 55 Cal.App.2d 661) ; and the formation and use of a corporation to transfer to it the existing liability of another person or entity (*Shea* v. *Leonis, supra,* 14 Cal.2d 666; *Engineering etc. Corp.* v. *Longridge Inv. Co., supra,* 153 Cal.App.2d 404). A perusal of these cases reveals that in all instances several of the factors mentioned were present. It is particularly significant that while it was held, in each instance, that the trial court was warranted in disregarding the corporate entity, the factors considered by it were not deemed to be conclusive upon the trier of fact but were found to be supported by substantial evidence.

In the instant case the presence or absence of any of these factors, as well as the consideration of any other circumstances which would have warranted the trier of fact to disregard the corporate entity, were within the province of the trial court. ▪ There was ample evidence to support the inferences drawn by the lower court that there was not such a

unity of interest and ownership as between Packing Co. and Meat Co., or as between Packing Co. and the individual respondents, as to destroy the individuality of such corporations and the owner or owners of their stock. We need not repeat the evidence in detail, but a reiteration of the following facts supports the sufficiency of the trial court's findings, to wit: Zaharis' ownership of 26 per cent of Meat Co.'s stock and his ownership of 100 per cent of Packing Co.'s stock; the ownership by Lafayette of 26 per cent of Meat Co.'s stock and the fact that he was not a director or officer of Packing Co.; the ownership by White and Frueh of 24 per cent of Meat Co.'s stock each and their nonownership of Packing Co.'s stock; the separate incorporation of two corporations at different times; the employment of separate counsel by each corporation and the fact that the attorney for Packing Co. was not the attorney for any of the respondents; the issuance of stock by Packing Co. pursuant to permit and its compliance with the formalities required by the Division of Corporations; the keeping of separate minutes by Packing Co. and its holding of a number of meetings; the maintenance of separate records and bank accounts by Packing Co.; the fact that Packing Co. had its own employees and a separate payroll; the extent of the participation of Zaharis and the other individual respondents in the daily business affairs of Packing Co.; the making of disbursements by Packing Co. through its own checks; the absence of the commingling of funds; the fact that Meat Co. supplied Packing Co. from 30 per cent to 45 per cent of the meat sold by the latter, the remainder coming from other suppliers; the preparation of the lease by appellant's own attorney and the naming of Packing Co. as the lessee therein; and Zaharis' statement that he did not want any personal liability and that he would form a new corporation. Any conflict in the evidence with respect to any of these matters was, of course, for the trier of fact to resolve.

Considerable stress is laid by the appellant upon the claim of undercapitalization and its assertion that such appears in the instant case as a matter of law. Appellant has not cited any case in which an appellate court has held that a business was undercapitalized when the court made a contrary finding. In almost every instance where the trial court has found inadequate capitalization there are other factors present. (See cases above cited with reference to capitalization.) In some cases there were no assets or capitalization at all. ▮▮ Evidence of inadequate capitalization is, at best, merely a factor to be

considered by the trial court in deciding whether or not to pierce the corporate veil. To be sure, it is an important factor, but no case has been cited, nor have any been found, where it has been held that this factor alone *requires* invoking the equitable doctrine prayed for in the instant case. In *Carlesimo* v. *Schwebel, supra,* 87 Cal.App.2d 482, a total capitalization of $1,221.82 was held not to be insufficient, as a matter of law, to operate a business engaged in the buying and selling of groceries. [9] Furthermore, we have testimony in the instant case, to the effect that the operating capital was adequate; that Packing Co. paid all of its bills for two years except for the money owed to Meat Co.; that the bills were paid promptly; and that the rent was paid until Packing Co. vacated the premises. There is also testimony by Zaharis that appellant's officer, Davidson, assured him that the capitalization would be adequate. This evidence, if believed by the trial court, would support its finding of adequate capitalization.

The appellant's assertion of inequitable result is predicated upon the argument that the respondents intentionally created a corporation without sufficient assets to meet daily business requirements. The thrust of this argument is the claim of undercapitalization and the contention that a creditor will remain unsatisfied if the corporate veil is not pierced. As we have pointed out above, the prerequisite of "inequitable result" must coexist with the other requirement of unity of interest and ownership, which the trial court has found not to exist in this case. Moreover, we have also indicated that the trial court was justified in its finding of adequate capitalization. ▆▆▆ Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an "inequitable result." In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor. ▆▆▆ The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil.

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 13, 1963.