Filed 3/26/21 Capture MRG v. TOP86 CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| CAPTURE MRG, INC., | B304711, B306043 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC684011) |
| v. | |
| TOP86, INC., et al., | |
| Defendants and Appellants. | |

APPEALS from an order and a judgment of the Superior Court of Los Angeles County. Barbara A. Meiers, Judge. Affirmed.

Bradley Arant Boult Cummings and Charles Edward Elder for Defendants and Appellants.

Law Offices of Larry Castruita, Larry S. Castruita and Stefon Jones for Plaintiff and Respondent.

_____

**INTRODUCTION**

A promotional products company sued a supplier and its alleged alter egos for breach of contract for supplying defective inflatable figures to be displayed in conjunction with a major motion picture release. The trial court found that the various individual and entity defendants were all alter egos of each other, and concluded after a bench trial that the supplier had breached its contract. The alleged alter ego parties appeal from the trial court's judgment imposing alter ego liability on them for the supplier's breach of contract and from the trial court's preceding sanctions order which found they were alter egos of the supplier. We conclude that substantial evidence supports the trial court's alter ego finding and affirm.

**FACTUAL AND PROCEDURAL HISTORY**

**A. The Alleged Alter Ego Parties**

This case involves an individual defendant and various entity defendants that the trial court concluded were all interrelated alter egos of each other, chiefly Liangbao "James" Han; Rivers Promo, Inc.; Slight Worlds, Inc.; and Top86, Inc.

Han is a businessman with interests in a variety of California promotional importing corporations as well as various importing, exporting, and supply companies in China. Rivers Promo, Inc., was formed on October 23, 2009. Han was listed as the owner on the statement of information filed with the Secretary of State on October 5, 2012. The similarly named Rivers Promo Solution was formed in 2011 listing Han as the owner. It was canceled on December 7, 2011, by the Secretary of State for nonpayment. Slight Worlds, Inc. (Slight Worlds) was formed in 2011 listing Han as the owner. Top86, Inc. (Top 86) was formed in 2013 listing Yue Fang "Jessica" Qui as the owner.

2

The articles of incorporation for Rivers Promo Solution and Top86, as well as the statement of information for River Promo, Inc. and Slight Worlds, list the exact same address and suite number in Whittier, California, as the address for all listed officers and for process serving for each company.

The articles of incorporation for Top86 were created and filed by accountant Kathy Liang. All 2014 tax returns for the alleged alter ego entities and Rivers Garment, Inc., another company owned by Han, were prepared and filed by Kathy Liang, the same person that prepared and filed Top86's articles of incorporation. The tax return documents also list the same Whittier business address and suite number.

B. **The Underlying Lawsuit**

In 2014, respondent Capture MFG, Inc. (Capture), a promotional products company, contracted with Top86 to supply large inflatable figures to be displayed at movie theatres in conjunction with the release of the major animated motion picture "Big Hero 6." Capture employee Shane Ball set up the contract through e-mail correspondence with someone he understood to be an employee of Top86 named Ken Morey or Mori.

Shortly after the first set of inflatable figures was shipped, Capture learned that some of the units were not holding air. Capture had to rush to fix and replace the defective units in time for the movie premier date. There was communication on this issue each day from September to November 2014 between Ball and Top86 contacts he understood to be Morey and Jessica Qui. Ball also spoke with Top86 contacts named Brenda and Tiffany about the project.

An employee of Han's, Henry Diaz, reached out to Ball during the same period to solicit business, and Capture came to understand that Han had some relationship with Top86. When Top86 began to avoid communication and refused to release the final shipment of units until they were paid $35,000, Ball asked Han if he could help get the units released.

At Han's direction, Ball ultimately paid $40,000 in a $38,000 cashier's check to Top86 and a $2,000 credit card payment to Rivers Promo, Inc., and received shipment of the outstanding units he had contracted for with Top86. Han is the sole director and sole owner of Rivers Promo, Inc.

When Ball went to Han's office to deliver the cashier's check and make the credit card payment to Rivers Promo, Inc., he realized that Top86 employees, including Brenda and Tiffany, were working in the same room. Diaz later testified that each of the alleged employees of Mr. Han worked for the alleged alter ego entities and Top86 in the same capacities. Han testified that Brenda and Tiffany had also worked to list products for Slight Worlds, which was incorporated during a period when Rivers Promo, Inc., was suspended from doing business.

On November 17, 2017, Capture filed a verified complaint against Top86, Han, and Han's entities for breach of contract and other claims, alleging that Han and the other entity defendants were alter egos of Top86.

### C. The First Sanctions Motion

On April 30, 2019, Capture filed a sanctions motion and motion to compel for failure to provide discovery relating to the alter ego allegations. This sanctions motion was unopposed. The trial court compelled depositions and accompanying document

4

requests on June 3, 2019. The trial court also awarded sanctions against the defendants in the amount of $17,657.50.

### D. The Second Sanctions Motion and Order Finding Alter Ego

Han subsequently appeared twice for deposition and produced some records relating to his businesses, but failed to complete his deposition both times, and failed to produce large categories of court-ordered requested documents relevant to his relationship to Top86, including bank statements, detailed employee information for his entities, and shipping records. The only employee information he provided was a list of names with no designation as to who they worked for or any other information. Han also repeatedly claimed to have no recollection or had confusion regarding who worked for him, what his relationship was to Top86, or what documents were in his possession.

On December 13, 2019, Capture filed a second sanctions motion, requesting that the trial court find "1) that Mr. Han gets money directly and/or indirectly from Top86, Inc.; [¶] 2) Top86 a now dissolved company was an alter ego of Mr. Han and the Entity Defendants; [¶] 3) that Mr. Han is directly associated with Top86, Inc.; and [¶] 4) that Mr. Han owns some portion of Top86, Inc."

Capture submitted an attorney declaration and exhibits in support of the motion, attesting, among other things:

(1) Top86 used the same business address and office location as the alleged alter ego entities.

(2) Top86 and the entity defendants used the same tax preparer.

5

(3) Henry Diaz, a former manager for Mr. Han, was deposed and testified that each of the alleged employees of Mr. Han actually worked for all the alter ego entity defendants, as well as for Top86, in the same capacities.

(4) Ball testified at his deposition that he viewed the office location and it was a group of desks with people answering phones for orders of promotional goods and with a large mail shelf at the front containing boxes with the names of Top86 and each of the entity defendants.

(5) Top86 and the other defendant entities each have the same business model for importing promotional goods from China for distribution in the United States.

(6) Diaz testified that some of the entity defendants were created to keep listing these services on trade platforms, during periods when other of the entities were banned for trademark infringement, in order to work around the bans and maintain a presence in the market.

(7) Bank statements provided and Han's deposition testimony indicate that the alleged alter ego entities controlled by Han transfer roughly $800,000 to $1.5 million per year each to a Chinese business affiliated with Han.

(8) The alleged alter ego entity defendant tax returns each show gross income of more than a million dollars per year for the years 2013–2015; but taxable amounts of less than $30,000.

The alter ego defendants attempted to file a late opposition to the second sanctions motion on the day of the hearing.  Citing to Han's deposition, they denied that Han or the other entity defendants were alter egos of Top86 and claimed that wire payments from Top86 to Han were for a "virtual office" arrangement and that checks from Top86 to Rivers Promo, Inc.,

6

and Slight Worlds were for other transactions, but filed no declarations or supporting exhibits in support of their attempted opposition. They also did not deny or provide any evidence refuting the evidence that Top86 and Han's other companies shared the same employees, used the same address, worked out of the same office suite, or that the alleged alter ego entities transferred substantial assets to overseas Chinese companies controlled by Han.

On January 3, 2020, the day of the hearing, the trial court ordered the opposition "lodged and not filed because it is untimely and Plaintiff properly objects to its consideration," but noted in its minute order that the court had briefly reviewed the opposition and "it nowhere states that the court's earlier discovery order was complied with in full."

On January 9, 2020, the trial court entered a minute order imposing " 'Issue sanctions' " and deeming that "[a]ll defendants are found to be the alter egos and agents of all other defendants." The trial court stated that "the Motion is and at all times has been clear as to its purpose to eliminate the 'issue' as well as any evidence intended to contradict plaintiff's claim that the individually named defendant, defendant Hahn [*sic*] aka Bao, is and at all pertinent times has been the alter ego of all of the corporate defendants named and that each of them, due to this connection, is and has been at the same time the alter ego of each other with the consequence that all parties are to be regarded as having acted as the agent principals of each other throughout all of the times, actions and matters embraced and covered by the Complaint(s) in this case." On January 21, 2020, the trial court entered a nunc pro tunc order adding $5,760 in monetary sanctions to the January 9 order.

The alter ego defendants timely appealed the sanctions order.

### E. Trial and Judgment

The matter proceeded to a bench trial on February 7, 2020. At trial, Capture voluntarily dismissed its other causes of action and proceeded solely on its breach of contract claims. Only three witnesses were called: Ball and another Capture employee named Daniel Venzke by Capture, and Han by the defendants. Defendants introduced no exhibits at trial.

With regard to Han's relationship to Top86, the trial court reiterated to counsel before his testimony that "[t]he court has found that he's the alter ego and these other companies are alter egos of one another. A breach of contract by the company will be deemed in this case to be a breach of contract by Mr. Han as a result of the earlier ruling." However, the trial court stated it would "let him try and express to the court what he feels his role was here," and "allow[] him to put on the record that he in essence disagrees with the finding that he's an alter ego." Han denied that he was an owner or shareholder in Top86 and described his relationship with Top86 as one of providing a "virtual office" and shipping services for Top86. In posttrial briefing, the alter ego defendants argued that they could not be alter egos of a corporation without an ownership interest being established.

On May 7, 2020, the trial court entered judgment finding that Top86 breached its contract with Capture and imposing alter ego liability against the alter ego defendants in a minute order without additional discussion of the decision.

The alleged alter ego defendants timely appealed from the trial court's judgment; this court subsequently consolidated the appeals from the sanctions order and from the final judgment.

## DISCUSSION

### A. Standard of Review

"In reviewing a finding of alter ego liability, we must consider whether the trial court's findings are supported by substantial evidence." (*Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th 293, 302.) The determination of whether a corporation is an alter ego of an individual or other organization is ordinarily a question of fact for the trial court and will not be disturbed if it is supported by substantial evidence. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248 (*Las Palmas*).)

In reviewing for substantial evidence, "we resolve all conflicts in the relevant evidence 'against the appellant and in support of the order.'" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 535 (*Sonora Diamond*).) Substantial evidence may be contradicted or uncontradicted; "[t]he appellate court has no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn from the conflicts." (*Wells Fargo Bank, N.A. v. Weinberg* (2014) 227 Cal.App.4th 1, 8.) Accordingly, an appellant raising a claim of insufficiency of the evidence assumes a "'daunting burden'": "The test 'is simply whether there is substantial evidence in favor of the respondent. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the

judgment must be upheld.  As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing.' " (*People v. Overstock.Com, Inc.* (2017) 12 Cal.App.5th 1064, 1079.)

The doctrine of implied findings applies to the trial court's alter ego findings because the alter ego defendants did not request a statement of decision.  (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.)  We thus "presume[] the trial court made all necessary findings supported by substantial evidence."  (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970 (*Acquire II*).)  The doctrine of implied findings is "a natural and logical corollary" to (1) the presumption of the correctness of the judgment; (2) the fact that all intendments and presumptions are made in favor of that correctness; and (3) the appellant's burden of demonstrating error with an adequate record.  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).)

We review discovery sanctions orders for abuse of discretion.  (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422.)  "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice."  (*Ibid.*)

**B.  Law of Alter Ego**

The alter ego defendants challenge the sufficiency of the evidence to support the trial court's finding that they were alter egos of Top86, and contend that the sanctions order was improper because it found Han and his entities to be alter egos of Top86 without finding that they were stockholders in Top86.

An alter ego determination is an equitable finding that rests in the trial court's discretion as a question of fact.  (*Las Palmas, supra,* 235 Cal.App.3d at p. 1248; *Stark v. Coker* (1942) 20 Cal.2d 839, 846 ["the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court"].)  The doctrine pierces a corporation's ordinary status as a legal entity distinct from its shareholders, officers, and directors "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 538.)  "Under the alter ego doctrine, . . . when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." (*Ibid.*)

"There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.)  However, there are two general requirements to pierce the corporate veil and hold the equitable owners or parties actually controlling the organization responsible for the corporation's conduct:  " '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' " (*Ibid.*; accord, *Sonora Diamond, supra,* 83 Cal.App.4th at p. 538.)  "[W]hile the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished.

Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity." (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838 (*Associated Vendors*).)

Although an alter ego finding depends on the specific circumstances of each case, courts have identified a host of factors that may be considered in applying the alter ego doctrine, including: "Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses [citations]; the treatment by an individual of the assets of the corporation as his own [citations]; the failure to obtain authority to issue stock or to subscribe to or issue the same [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities [citations]; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family [citations]; the use of the same office or business location; the employment of the same employees and/or attorney [citations]; the failure to adequately capitalize a corporation; the total absence of corporate assets and undercapitalization [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another

12

corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; the use of the corporate entity to procure labor, services or merchandise for another person or entity [citations]; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations]; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions [citations]; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citations]." (*Associated Vendors*, *supra*, 210 Cal.App.2d at pp. 838–840; see generally *Sonora Diamond, supra,* 83 Cal.App.4th at p. 538–539; *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811.) "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." (*Sonora Diamond,* at p. 539.) Generally, where alter ego has been found, "several of the factors mentioned were present." (*Associated Vendors,* at p. 840.)

**C. Sufficient Evidence Supports the Trial Court's Findings of Alter Ego and Implied Finding that Han Was an Equitable Owner of Top86**

Within this framework, we consider the trial court's findings that Han and the other entity defendants were alter egos

13

of Top86, resolving all conflicts in the evidence in favor of Capture. Several of the factors itemized by the court in *Associated Vendors* are present in this case: Evidence was presented that Top86 and the Han entities used the same address and office suite, employed the same employees, and used the same tax preparer. Plaintiff was told to make payments to Top86 by delivering a check to Han and to secure delivery of Top86's contracted products by paying additional funds to Rivers Promo, Inc., indicating a unity of interest and comingling of funds. Han's refusal to provide detailed employee records, bank statements, or comprehensive transaction records between Top86 and the other entities suggests the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest. The overlap in employees, identical business models, and lack of detailed employment records or written business agreements between the entity parties indicates disregard of legal formalities and the failure to maintain arm's length relationships among related entities. Finally, the payment of funds overseas to Han's Chinese business interests and very low claimed profits suggest a pattern of improper diversion of corporate assets to Han's individual benefit.

This commingling of funds, employees, tax preparer, and office space among Top86 and the alleged alter ego identities, combined with Han's bad faith behavior and evidence of Han's sole control and underreporting of income of the alleged alter ego identities and overseas diversion of funds, is sufficient to establish such unity of interest and ownership that the separate personalities of the corporation and the individual no longer

14

exist—the first of the two requirements necessary for a finding of alter ego.

The second requirement, that an inequitable result will follow if the acts are treated as those of Top86 alone, is also supported by substantial evidence. The timing of Diaz reaching out to Ball just as Top86 was refusing to release its shipment without payment is suspicious; and Han's direction to Ball to pay funds to Rivers Promo, Inc., to secure release of Capture's outstanding products, combined with Han's persistent refusal to produce relevant documents about his entities, employees, and relationship with Top86 gives rise to an inference of bad faith and the conclusion that Han manipulated the corporation in order to avoid the liability that was bound to accrue to Top86 for its breach. The payment of funds to Rivers Promo, Inc., for "mediating" the situation with Top86 appears to have occurred for the purpose of Han capturing the final Capture payment at a premium through a different corporate entity under his control. It would be inequitable to allow Han and his affiliated entities to use the corporate form to shield himself from liability in this manner. The trial court's findings of alter ego are sufficiently supported by the evidence.

Appellants' core argument is that the trial court made no finding on the "threshold question" of whether Han or the other entity defendants were stockholders of Top86. It is true that "[t]he unity of ownership and interest demonstrated in the two personalities is reflected in the ownership by the individual in the stock of the corporation; when it is absent, the alter ego doctrine is generally unavailable." (*CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 788, citing *Riddle v. Leuschner* (1959) 51 Cal.2d 574, 580 [finding no "unity of interest

15

and ownership" between individual defendant and alleged alter ego corporations where it was "undisputed that he held none of the stock, and there is no evidence that he had any interest as an owner in the business operated by either of the two corporations"].) "Under California law, '[o]wnership is a pre-requisite to alter ego liability, and not a mere "factor" or "guideline" ' " (*Bradley*, at p. 788), although an owner who owns even one single share of corporate stock may be subject to alter ego liability "provided that the *alter ego* doctrine is otherwise applicable." (*Riddle,* at p. 580.)

However, any argument based on the trial court's failure to make an *express* finding that Han or the alter ego entity defendants were equitable owners of Top86 is waived because the alter ego defendants never asked for a statement of decision and the trial court did not provide one, contrary to appellants' mischaracterization on appeal that the judgment minute order was a "statement of decision." "A party's failure to request a statement of decision when one is available has two consequences. First, the party waives any objection to the trial court's failure to make all findings necessary to support its decision. Second, the appellate court applies the doctrine of implied findings and presumes the trial court made all necessary findings supported by substantial evidence." (*Acquire II, supra*, 213 Cal.App.4th at p. 970.) "The question then becomes whether substantial evidence supports the implied factual findings." (*Fladeboe, supra,* 150 Cal.App.4th at p. 48.)

The doctrine of implied findings thus "requires us to infer the trial court impliedly made every factual finding necessary" (*Fladeboe, supra,* 150 Cal.App.4th at p. 48) to conclude that Han and the defendant entities were alter egos of Top86, including

16

that they were "the persons or organizations actually controlling the corporation, in most cases the equitable owners" (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 538). Accordingly, we infer the trial court made an implied finding that Han and his companies had some degree of equitable ownership and actual control of Top86, despite the fact that Han was not named as a stockholder on the corporate documents. This implied finding is supported by substantial evidence. In particular, that Han's employees worked for all of the entities in the same capacities, that his employees expressly presented themselves to Ball as employees of Top86, and that Ball was able to secure shipment of the products Capture had ordered from Top86 by delivering payment to Han and to Rivers Promo, Inc., when Top86's purported managers stopped responding to his communication, indicates that Han had equitable ownership and actual control over Top86. Our conclusion, as it must, does not reweigh the evidence or the trial court's credibility determination.

Moreover, given Han's persistent refusal to produce court-ordered documents, complete deposition, or give detailed employee information relevant to his actual relationship with Top86—including providing a partial list of employee names with no information on their job title, duties, or which corporation they worked for, and repeatedly claiming confusion or lack of recollection regarding who worked for him in what capacity—the trial court was entitled to conclude that Han was concealing an ownership interest in Top86. (See *Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 605 ["When a party does not produce ordered documents, the court is entitled to infer the documents would contain evidence damaging to that party's case"].) Appellants argue that alter ego should

apply "only when the ends of justice so require." (*Mesler, supra,* 39 Cal.3d at p. 301.) Here, given Han's persistent bad faith behavior and abuse of discovery, the ends of justice also support the trial court's implied finding that he was an equitable owner of Top86 and that the alter ego doctrine should apply.

Because there was substantial evidence to support the trial court's express and implied findings that Han was an equitable owner of Top86, that he and his other entities had a unity of interest with Top86, and that it would be inequitable to treat Top86's breach of contract as the action of the corporation alone, the trial court's sanctions order was not improper and the judgment is affirmed.

## DISPOSITION

The order appealed from in B304711 is affirmed.  The judgment appealed from in B306043 is affirmed.  Capture MRG, Inc., is awarded its costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.